Donald J. BOYER and William T. Harley,
Defendants Below, Appellants,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted June 16, 1981.

Decided Oct. 1, 1981.

A. Gary Wilson (argued), Wilmington, for Boyer, defendant below, appellant.

David M. Lukoff (argued), Asst. Public Defender, Wilmington, for Harley, defendant below, appellant.

John A. Parkins, Jr. (argued), Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C. J., McNEILLY and HORSEY, JJ.

McNEILLY, Justice:

Defendants, Donald J. Boyer and William T. Harley, appeal their Superior Court jury convictions and sentences. Defendant Boyer was convicted of Attempted First Degree Murder, First Degree Robbery, First Degree Burglary, Second Degree Conspiracy, First Degree Reckless Endangering, Possession of a Deadly Weapon during the Commission of a Felony, and Possession of a Deadly Weapon by a Person Prohibited. Defendant Harley was convicted of First Degree Robbery, First Degree Burglary, and Second Degree Conspiracy.

The defendants raise several claims of error, some of which overlap. Specifically, defendant Harley contends that the evidence was insufficient to support the Trial Court's decision. Defendant Boyer claims that certain of his oral statements made during custodial interrogation were improperly admitted at trial, that the Trial Court improperly refused to give a missing witness instruction, and that the indictment against him was deficient because it failed to support the charge of reckless endangering. In addition, defendant Boyer contends that hearsay evidence was improperly admitted against him at trial and that his right to be free of double jeopardy was violated when the Trial Court refused to merge his convictions of Attempted Murder in the First Degree and Possession of a Deadly Weapon during the Commission of a Felony and his convictions of Robbery in the First Degree and Burglary in the First Degree. Both defendants argue that the Trial Court failed to give the correct instruction on the burden of proof, that the prosecutors' rebuttal contained prejudicial comments upon the defendants' failure to testify and effectively shifted the burden of proof onto defendants, and that the Trial Court erred in refusing to compel the State to disclose to defendants the criminal record of the State's chief witness. We affirm.

I

The basic facts of this case are not complex. On the evening of October 19, 1979 Ricardo Scott, the victim, and an adult companion, Sherri Pruden, were baby sitting at 2900 Rosemont Avenue, the home of Theresa McDaniel. Sometime close to midnight, as Scott answered a knock at the front door, two men pushed their way into the house. One of the intruders, later identified as defendant Boyer, began pistol whipping Scott. At that point, Sherri Pruden ran from the house pursued by the second intruder, defendant Harley. As the struggle continued, Scott was shot in the head by

Boyer who then took one hundred seventy dollars from Scott and fled.

During questioning by the police, Scott and Pruden were uncooperative. However, Scott did describe the getaway car. He also described Boyer as being a black male, six feet tall, light-skinned, and wearing a "Fu-Manchu" mustache. He stated that he had gambled in the area of Taylor and Bennett Streets with Boyer three years before. It was not until January, 1980 that the police learned that Scott and Pruden had recognized both defendants on the night of the intrusion. Pruden knew Boyer by nickname only, but Harley she knew and, in fact, had been with him on the day of the incident in question. Scott, on the other hand, knew neither Boyer nor Harley by name, but he had sold Harley drugs on the day of the shooting at the McDaniel home, a well known drug outlet. Scott also knew approximately where Harley's family lived and associated Harley with the car he drove and by his general appearance. Scott withheld this information from the police because he thought he could find Boyer if he located Harley, and he wanted to retaliate in his own way. Scott's mother, however, convinced him that he should cooperate with the police rather than retaliate on his own.

For more than two months the police investigation stagnated. On January 5, 1980, however, Scott ran into Harley at the home of mutual friends. Apparently a scuffle ensued and Harley jumped out of a window. Harley later returned and was restrained by Scott while the police were called.

After arresting Harley, the police took him to the police station. There he was advised of his rights. Harley stated that he had been at the McDaniel home at 2900 Rosemont Avenue early in the day on October 19; that he had taken Sherri Pruden to the grocery store; and that he and Sherri had gone to New Jersey and gotten a room at the Dutch Inn on Route 295. Harley further stated that he returned to Delaware after Sherri Pruden left the Dutch Inn because he discovered that she had stolen some money from him. After his return to Delaware, defendant Harley proceeded to a bar in Chester and, later that evening, returned to the motel in New Jersey where he remained until the following day.*

On the evening of January 5, 1980, Scott was taken to the police station to sign warrants. While at the station, Scott was given several books and stacks of pictures. In one of the stacks of pictures, Scott found the picture of the man who shot him. The picture was of Donald Boyer.

Sherri Pruden was taken to the police station on March 19. At that time, she looked at photographs and was able to identify Donald Boyer as the man who hit Scott. It was then that Sherri Pruden, for the first time, told police that she had recognized the man with the gun who assailed Scott as a man known to her as "Jake." This man was Donald Boyer.

At trial, certain facts were revealed which apparently had not been known previously. Scott repeatedly stated to the police that he did not know his assailants and that he himself does not sell drugs though occasionally he smokes marijuana. Theresa McDaniel testified that Scott had, on October 19, sold drugs, probably methamphetamines, to Anthony Borsello and William Harley. She stated that both Borsello and Harley had been in her house on that day. She further testified that her home is a well-known area for purchasing drugs.

Upon being recalled, Scott testified that he had sold drugs to Harley on October 19 but only as a favor for Ms. McDaniel who was away from the residence. Further, he stated he had recognized Boyer as the man who shot him and Harley as the man who drove Boyer away.

---

* Sherri Pruden's recollection of the incident differed. She contended that Harley was asked by Ricardo Scott, her boyfriend, to take her to the grocery store on October 19, 1979. Instead, she claims that Harley took her to the Dunleigh area in New Castle and forced her to have sexual relations with him.

## II

Defendant Harley contends that the evidence presented at trial did not support the verdict beyond a reasonable doubt. Specifically, Harley argues that the State failed to introduce any credible evidence connecting him with the crime except for Scott's testimony alone. Defendant Harley claims that Scott's testimony was incredible because Scott gave inconsistent testimony on drug usage, did not tell the police about Harley until January 5, 1980, and did not mention the presence of a getaway car until January 5. Further, defendant argues that because Scott was severely beaten and later shot in the head, a real question existed as to Scott's ability to observe the events in question.

The State argues that, applying the test for sufficiency of the evidence announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and adopted in *Young v. State*, Del.Supr., 407 A.2d 517 (1979), this Court can only conclude that the evidence was sufficient to support the verdict.

The United States Supreme Court stated the test in *Jackson*:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. 443 U.S. at 319, 99 S.Ct. at 2789.

Here, Scott identified defendant Harley as one of the men involved in the incident of October 19, 1979. Though Scott's credibility and ability to perceive may be subject to attack, we think that a rational trier of fact could believe that testimony, find Harley to be involved, and find guilt beyond a reasonable doubt.

## III

At two times in rebuttal summation, the prosecutor attempted to attack defendants' alibi by stating that they had failed to rebut the fact that they did not know each other.

> "... there's absolutely no rebuttal on the part of the defense that he does not know defendant Boyer."

> "There's no rebuttal on the part of the defense, Harley's defense, that he doesn't know McDaniel, that he doesn't know the house...."

The defendants contend that these remarks by the prosecutor constituted impermissible direct comments on the defendants' failure to testify.

The State argues that the error, if any, must amount to plain error because the defendants neither objected to the summation at trial nor requested a cautionary instruction. The State argues that the prosecutor, in summation, never made a direct reference to defendants' failure to testify. Thus, *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the only authority cited by defendant, has no application to the present controversy. Any error must be attributable to an indirect reference to defendant's failure to testify and defendant cites no authority for such indirect references to be error. Further, the State argues that the Trial Court instructed the jury that a defendant is not compelled to testify in a criminal case and no presumption or inference of guilt arises from such refusal to testify.

It appears that these comments were unobjected to and, thus, must amount to plain error in order to reverse. *Griffin* does

not support defendant's contention that alleged indirect comment on a defendant's failure to testify amounts to plain error. In *Griffin* to prosecutor directly commented on defendant's failure to testify by stating that "defendant knew about the death and did not testify." The Court also commented on defendant's silence by instructing the jury that they could draw an inference of guilt from defendant's failure to explain facts which he could reasonably be expected to explain or deny. The United States Supreme Court stated that the 5th and 14th Amendments forbid comment by the prosecutor on the accused's silence or instructions by the Court that such silence is evidence of guilt.

■ Here, the remarks made by the prosecution, at most constituted indirect comments on defendants' failure to testify. However, the comments were not objected to and the Trial Judge clearly instructed the jury that silence raises no inference of guilt. Moreover, the Trial Judge in his instructions clearly stated that the defendants were presumed innocent until proven guilty beyond a reasonable doubt. Thus, while the prosecutor's comments border on error, they were insufficient to amount to reversible error.

### IV

■ Defendant Boyer argues that oral statements made by him during custodial interrogation concerning his employment on October 19 and 20, 1979 were improperly admitted at trial in violation of his right to counsel and right against self-incrimination. He argues that the statements were obtained prior to his being advised of the charges against him and after he had requested to see an attorney.

The State contends that the oral statements were properly admitted because defendant was advised of his *Miranda* rights and the charges against him; that defendant waived his rights; that the statements preceded rather than followed the request for an attorney; and that the statements related to a collateral matter.

The evidence concerning defendant's oral statements revealed that Boyer was arrested on January 8, 1980. At that time he was taken to the police station where he was questioned by two officers, Detectives Founds and Partlow. Detective Partlow gave Boyer his *Miranda* warnings in the presence of Detective Founds. Boyer acknowledged that he understood those rights. Boyer denied involvement in or knowledge of the incident. At some time during the questioning, Boyer stated that he had been working at Daniello's Construction Co. on October 19, 1979 and, after work, went home where he remained all evening. On October 20, 1979, he arose and rode to work with Richard Pretlow. After work he returned home and remained there all evening.

At some point during the interrogation, one of the Detectives asked Boyer to take a polygraph examination. Boyer declined and requested an attorney. Detective Founds' handwritten notes indicate that the questions concerning employment, which could have been considered by the jury as impeaching Boyer's credibility, were posed after Boyer requested an attorney. However, in his testimony, Founds indicated that, although he could not remember the sequence of questioning, he could remember that questions relative to the incident were not asked after Boyer requested an attorney.

The Trial Court ruled that the statements were admissible. The Court found that Boyer was given his *Miranda* warnings prior to questioning and that Boyer was informed of the nature of the charges against him at that time. The Court determined that Boyer voluntarily, knowingly and intelligently waived those rights. Further, the Court found that based upon the evidence presented the most likely inference was that the employment questions preceded rather than followed the defendant's request for an attorney.

■■ Based upon its findings of facts, the Trial Court properly applied the applicable law. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

requires that procedural safeguards be used prior to custodial interrogation in order for statements taken during interrogation to be admissible at trial. *Miranda* warnings were given here. Those rights can be waived expressly or implicitly. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Defendant here implicitly waived his rights by responding to questioning after acknowledging that he understood his rights. A waiver may be withdrawn at any time. A request for an attorney is a per se invocation of an accused's right to remain silent and a withdrawal of any prior waiver. *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Once an accused has requested the presence of an attorney, all questioning must cease until counsel has been made available to him unless the accused himself initiates further communication with the police. *Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Here, it appears that defendant requested the presence of an attorney yet was still questioned after the request was made. Any statement made after the request would be inadmissible.

As previously stated, the Trial Court found the employment questions to have been made prior to defendant's request for an attorney. Evidence exists in the record to support this finding. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972). Thus, the Trial Court's finding should be affirmed.

## V

■ Defendant Boyer argues that the Trial Court denied him a fair trial by the Court's refusal to give the jury a requested missing witness instruction. Specifically, the instruction related to Detective Partlow's activities in questioning witnesses in the vicinity of Taylor and Bennett Streets to determine whether Scott knew Boyer from Boyer's having frequented that known gambling area. Since the State did not produce these witnesses at trial, the defendant requested and was denied an instruction that the testimony gathered may be presumed to have been unfavorable to the State.

The State correctly argues that the Trial Court properly refused the instruction for two reasons. First, the only reported decision on the subject, *Buckley v. H. R. Johnson Co., Inc.*, Del.Super., 2 Terry 546, 25 A.2d 392 (1942), holds that such an instruction violates Article IV § 19 of the Delaware Constitution because the instruction amounts to an impermissible comment on the evidence. Second, various other reasons exist for not producing the witnesses, namely, time, money and the witnesses' desire not to become involved. Thus, we reject defendant's contention.

## VI

■ Defendant Boyer argues that Count V of the indictment is fatally defective in charging an offense for reckless endangering. Specifically, defendant argues that the indictment does not show on its face that the Grand Jury found sufficient prima facie evidence of one crucial element of the offense—that firing a handgun in the near vicinity of the victim in and of itself created a substantial risk of death.

The State maintains that the indictment states a charge of reckless endangering because it contains a sufficiently definite statement of the essential facts constituting the charge and clearly places defendant on notice of the offense with which he is charged.

11 *Del.C.* § 604 defines reckless endangering:

A person is guilty of reckless endangering in the first degree when he recklessly engages in conduct which creates a substantial risk of death to another person.

Count V of the indictment charged the defendants as follows:

Donald J. Boyer and William T. Harley, on or about the 20th day of October, 1979, in the County of New Castle, State of Delaware, did recklessly engage in conduct creating a substantial risk of death to another person, to wit: did fire a handgun in the near vicinity of Shamecka McDaniel, a 9 year old girl.

An indictment is sufficient if it "... contains a plain and definite statement of the essential facts constituting the offense charged." *State v. Oakes*, Del.Supr., 373 A.2d 210, 214 (1977); *Brown v. State*, Del. Supr., 239 A.2d 628 (1968). The indictment need not mimic the words of the statute. In the case at bar, the indictment alleges the facts necessary to constitute the crime of reckless endangering. It charges defendants with shooting a handgun near a child. This act created a substantial risk of death. Further, the indictment clearly follows the wording of the statute. As such, the indictment is sufficient to charge the defendant with the crime of reckless endangering.

### VII

Defendant claims that the Trial Court committed plain error in permitting Detectives Founds and Partlow to testify as to what unidentified persons in the area of Taylor and Bennett Streets stated to Detective Partlow. Defendant asserts that such statements were inadmissible hearsay.

The State argues that no error occurred, pointing out that the defendant failed to cite any portion of the record from which he asserts error or case authority which supports his claim that an unsuccessful attempt to insert hearsay constitutes plain error. We agree.

### VIII

Defendant Boyer contends that the Trial Court erred in imposing separate sentences for the crimes of attempted first degree murder and possession of a deadly weapon during the commission of a felony and for first degree burglary and first degree robbery.

This argument is without merit. The defendant was not illegally sentenced pursuant to this Court's most recent pronouncements in *Hunter v. State*, Del.Supr., 430 A.2d 476 (1981); *Evans v. State*, Del. Supr., 430 A.2d 481 (1981).

### IX

Harley and Boyer both argue that the Trial Court erred in failing to instruct the jury that the State had the burden of proving defendants' guilt beyond a reasonable doubt. Defendants argue that the Court instructed the jury as to the meaning of reasonable doubt and that proof beyond a reasonable doubt must exist before a defendant may be convicted of a crime; however, the Court did not explicitly place this burden on the State. Thus, defendants argue that, by omitting such an instruction, the Court permitted the jury to speculate as to placement of the burden of proof.

The State concedes the omission of an instruction on burden of proof but argues that the Court did not commit legal error by such omission. The State contends that the jury instructions when considered as a whole clearly place the burden of proof on the State.

Though the Court did not specifically instruct the jury that the State had the burden of proving defendants guilty beyond a reasonable doubt, the necessary corollary of the instructions, viewed as a whole, was that the State had the burden of proof.

Throughout the instructions, the Court stated that the jury must find the defendants guilty beyond a reasonable doubt in order to convict them of the offenses charged. The Court itself, in its denial of defendant's motion for a new trial, stated that it so instructed the jury on reasonable doubt at least twenty-one different times. The Court also instructed the jury that a defendant in a criminal case never has the burden of proving his own innocence:

> The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The law presumes every person charged with a criminal offense to be innocent, and you must give the presumption of innocence effect by finding the defendants not guilty unless you are convinced by the evidence that the defendant is guilty beyond a reasonable doubt.

These instructions clearly impose the burden of proof on the State and not the defendant.

## X

Defendants argue that the Trial Court erred in denying the defense request for *Brady* material. See *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, defendants contend that prior to Mr. Scott's testimony, the defendants requested the State to supply them with a record of Mr. Scott's prior convictions in foreign states. Defendants argue that the Court erred in denying that request.

The State contends that no error occurred because the defendants never contended or proved that the State had the requested material in its possession, actual or constructive. The State asserts that while *Brady,* in certain cases, mandates the disclosure of information in possession of the prosecution, *Brady* does not require the prosecutor to seek out information not in the State's possession.

Here, the real issue is whether the State had the requested information concerning Scott's out of state convictions in its possession. In *Brady,* supra, the United States Supreme Court held that due process is violated where the prosecution fails to deliver, upon request by the accused, evidence in its possession which is material to guilt or punishment and favorable to the accused. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court refined its holding in *Brady* by specifying three situations to which *Brady* applies: 1) the knowing use of perjured testimony by the prosecution; 2) a specific request for exculpatory evidence; and 3) a general request and, also, no request made for exculpatory evidence.** In *Stokes v. State,* Del.Supr., 402 A.2d 376 (1979), this Court listed six factors to be considered in determining materiality in each of the three

*Agurs* situations. These factors include: 1) favorability; 2) admissibility of the evidence at trial; 3) extent of probative value; 4) cumulative nature of the evidence; 5) weight of the other evidence presented at trial; and 6) deference to the opinion of the Trial Judge. *Stokes,* supra, at 380 (citations omitted).

While these cases require that so-called "*Brady* material" in the State's possession be disclosed upon a proper showing of materiality, they provide no clue as to what evidence is deemed to be in the possession of the State for the purpose of a *Brady* disclosure. Indeed there is a paucity of authority on this issue. The only pertinent case cited to us is *Lewis v. United States,* D.C.C.A., 393 A.2d 109 (1978), aff'd on rehearing, 408 A.2d 303 (1979). The *Lewis* court found that a federal prosecutor with the United States Attorney's Office was deemed to know and be in possession of all prior convictions of government witnesses contained in F.B.I. records.[1] The State is quick to point out that *Lewis* involved a federal prosecutor and the F.B.I., and not a state prosecutor and the F.B.I. as in the instant case. Moreover, the State seeks to distinguish *Lewis* from the case at bar on the grounds that the *Lewis* court held as it did because the U. S. Attorney's Office and the F.B.I. are both part of the United States Department of Justice and the federal prosecutor conceded easy accessibility to F.B.I. records. This close relationship and accessibility, urges the State, is not present between the State and the F.B.I. and prevents the State from being in possession of F.B.I. records.

 If the State either has in its actual possession or has access to the F.B.I. criminal records of witnesses for the prosecution, *Brady,* of course, would mandate

---

** In *Agurs,* the United States Supreme Court equated the failure of defense counsel to request *Brady* material with a general request for all *Brady* material because the prosecution must disclose evidence which clearly supports a claim of innocence by the defendant whether or not the defendant makes a general request for or fails to request *Brady* material. *Agurs,* supra, 427 U.S. at 108, 96 S.Ct. at 2399.

1. The *Lewis* court specifically left open the question of whether federal prosecutors are deemed to possess criminal records held by local governments and routinely available to federal prosecutors. *Lewis,* supra at 310.

disclosure of those records to a defendant who requests them; otherwise the State could purposely withhold such records from the defendant in order to prevent him from using them to challenge the veracity of the State's witnesses. Such a possibility would be manifestly unfair and could not be permitted. In the instant case, the State contends that it did not have access to the F.B.I. criminal records requested by defendant. We find nothing in the record to refute that contention. Therefore, we find no error in the Trial Judge's denial of defendants' request for production.

\* \* \*

For the reasons stated, we AFFIRM the convictions and sentences below.