Donald J. BOYER, Petitioner,

v.

Supt. Walter REDMAN and the Attorney General of the State of Delaware, Richard Gebelein, Respondents.

Civ. A. No. 81–530.

United States District Court, D. Delaware.

Dec. 13, 1982.

Richard D. Allen, Donald E. Reid, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for petitioner.

John A. Parkins, Jr., James B. Ropp, Dept. of Justice, Wilmington, Del., for respondents.

## OPINION

STAPLETON, District Judge:

Donald J. Boyer, the petitioner in this habeas corpus proceeding brought pursuant to 28 U.S.C. § 2254, was convicted by a Delaware State jury on April 10, 1980 of attempted first degree murder, first degree robbery, first degree burglary, second degree conspiracy, first degree reckless endangering, possession of a deadly weapon during the commission of a felony, and possession of a deadly weapon by a person prohibited. His convictions were affirmed by the Supreme Court of the State of Delaware. That Court's opinion sets forth the evidence before the jury in some detail. *Boyer v. State,* 436 A.2d 1118 (D.Del.1981). A more abbreviated description will suffice for the purpose of this proceeding.

On the evening of October 19, 1979, Wilmington police went to the McDaniel residence at 2900 Rosemont Avenue, Wilmington. Upon arriving, they were told by Ricardo Scott, who was in the residence at the time, that two men had forced their way

into the home, that one of the men chased his companion Sheri Pruden, out of the house, and that the other man robbed him of approximately $170.00. Scott also reported to the police that he had been shot in the head during the struggle. He supplied the police with a description of his assailant. Ms. Pruden reported to the police that she did not know either of the men who entered the residence, that she did not see a gun, and that she did not hear a shot.

Several months later, Scott told the police for the first time that a third person had been involved as the driver of a getaway car and that his name was William Harley. A few days later, Scott picked petitioner's picture from a non-suggestive display of photographs shown to him by the police and claimed that petitioner was the person who shot him.

Subsequently, Ms. Pruden also picked petitioner's picture out of a non-suggestive display of photographs. She stated that petitioner's picture looked like a man she knew as "Jake" and that Jake was Scott's assailant.

On the basis of these identifications, petitioner was indicted and tried for several separate offenses. At the trial, the State did not introduce the weapon, any fingerprint evidence, or any other physical evidence tending to link petitioner or William Harley to the alleged incident. Thus, the State's case against petitioner rested primarily on the testimony of Scott and Ms. Pruden.

Scott's testimony at the time of the trial was to the effect that he was uncooperative with the police at the time of the incident and supplied them with false and misleading information concerning his assailant. He attempted to justify that action by claiming that he had recognized Harley as the driver of the getaway car and that he thought that he could find out who the other individuals were and get personal revenge against all of them by going after Harley.

He also initially testified that he did not use drugs and had not sold drugs to Harley earlier on the day of the incident. He changed that testimony, however, after the owner of the residence where the incident occurred testified that Scott had been selling drugs at her house for several weeks and had sold drugs to Harley and a man named Borsello on the afternoon of the incident.

Ms. Pruden's testimony at the trial was limited to a statement that the person who shot Scott was someone who looked like a person she knew from the streets as Jake. She testified that she was not sure who it was that shot Scott because she got only a quick glimpse of the assailant. Finally, she testified that she and Scott met Harley for the first time on the afternoon of the incident and that Harley raped her on that afternoon after offering to drive her to the grocery store.

During the course of Scott's trial testimony, petitioner's counsel requested that the prosecutor supply him with an F.B.I. "rap sheet" for Scott. The prosecutor declined to do so, but asked Scott whether he had any prior felony convictions. Scott testified that he had none. At no time prior to Scott's testimony did petitioner or his State trial counsel specifically request an F.B.I. rap sheet for Mr. Scott. A general pre-trial *Brady* request was made, however.

In the course of the proceedings before the Supreme Court of Delaware, the State requested and obtained an F.B.I. rap sheet for Scott. That rap sheet indicated that Scott had been arrested on several occasions in Pennsylvania and had been convicted in 1973 of the crimes of assault and battery on a police officer and resisting arrest. Both of these crimes were misdemeanors under Pennsylvania law.[1] Under Delaware law,

1. According to a stipulation of the parties, Scott was convicted of these crimes on June 11, 1973. Apparently, he was convicted under former Title 18 of the Pennsylvania Statutes, § 4314 (Obstructing an officer in the performance of his duties) which carries a maximum term of imprisonment of one year, and § 4708 (Assault and Battery) which carries a maximum term of imprisonment of two years. Former Title 18 was repealed on June 6, 1973 but it continued to govern offenses committed prior

however, assault and battery on a police officer is a felony. *See* 11 Del.C. § 612(4). Accordingly, under Delaware evidence law in effect at the time of petitioner's trial, the assault and battery conviction would have been admissible to impeach Scott's credibility. *State v. Witsil,* 37 Del. (W.W.Harr.) 553, 187 A. 112 (Oyer and Terminer 1936).[2]

When petitioner's counsel made his request for a "rap sheet" in the trial court he made the following statement:

> This also may be a convenient time to make a second request, and that is that the State use its facilities to determine whether Mr. Scott has any conviction in foreign states for—or sister states for a felony. We have made the request of the State. They have refused to do that for us. We have attempted to utilize the services of the probation office also, unsuccessfully, and it would be a simple procedure for the State to punch the buttons for its connections with the FBI computer to find out those facts, and it may be essential to the State's being able to properly cross-examine rather, the defense being able to properly cross-examine Mr. Scott.

The trial court ruled, as a matter of law, that petitioner was not entitled to the information sought. It observed:

> I know of no requirement that the State supply defense counsel with the record of every witness it calls. There might be a day when there is such a requirement, but there is none now, and there's no basis for ordering the State to do so.

On appeal, the Supreme Court of Delaware disagreed with the trial court's view of the law, but affirmed the convictions on the ground that the trial record did not affirmatively evidence that the State had access to the F.B.I. criminal records requested:

> If the State either has in its actual possession or has access to the F.B.I. criminal records of witnesses for the prosecution, *Brady,* of course, would mandate

disclosure of those records to a defendant who requests them; otherwise the State could purposely withhold such records from the defendant in order to prevent him from using them to challenge the veracity of the State's witnesses. Such a possibility would be manifestly unfair and could not be permitted. In the instant case, the State contends that it did not have access to the F.B.I. criminal records requested by defendant. We find nothing in the record to refute that contention. Therefore, we find no error in the Trial Judge's denial of defendants' request for production.

*Boyer v. State,* 436 A.2d 1118, 1126–27 (Del. Supr.1981).

Following issuance of the opinion of the Supreme Court, petitioner moved for reargument, asserting that the prosecutor had never denied that he had access to the F.B.I. information and requesting that the case be remanded for further proceedings. That motion was denied.

During the proceedings before this Court, petitioner and respondent stipulated to the following facts concerning access of Delaware prosecutors to F.B.I. "rap sheets":

1. The Delaware State Police maintain a computer system ("DelJus System").

2. Since at least 1978, the Delaware Attorney General's office has maintained two in-office computer terminals through which direct access may be obtained to the DelJus System.

3. During the same period of time, the Attorney General's office has been able to obtain F.B.I. "rap sheets" through the DelJus System as follows:

(a) A request for an F.B.I. rap sheet is electronically sent from the computer terminal in the Attorney General's office to the Delaware State Police;

(b) The Delaware State Police relay that request to the F.B.I. office in Washington by means of a written re-

---

to that date. Historical Note to current Title 18, Part I, Chapter I, Pa.C.S.A.

**2.** Rule 609(a) of the Delaware Uniform Rules of Evidence, which modifies *Witsil,* did not become effective until July 1, 1980.

quest or a telephone or electronic message;

(c) The F.B.I. then supplies the rap sheet to the Delaware State Police who, in turn, deliver it to the Attorney General's office. The rap sheets are transmitted to the State Police by mail; they are not transmitted by computer.

(d) There is generally a delay of approximately 30 days between the time a rap sheet is requested and the time it is received by the State Police, although when reason exists (such as an emergency) rap sheets can be obtained much more quickly.

4. Rap sheets are provided to the Delaware State Police by the F.B.I. at no charge.

5. The Delaware State Police generally receive about three requests per month from all sources for F.B.I. rap sheets. Over the last four years, the Attorney General's office itself has requested F.B.I. rap sheets at least 20 times.

6. The F.B.I. has never refused to supply a rap sheet requested by the Delaware State Police.

7. Since 1974, the F.B.I. has had a policy of providing rap sheets to prosecuting attorneys for delivery to defense counsel in connection with criminal cases.

Petitioner has not requested an evidentiary hearing in this Court.

## I. EXHAUSTION OF STATE COURT REMEDIES.

There is a threshold issue as to whether plaintiff has exhausted his State remedies with respect to one of the issues he presses before this Court. Respondent asserts that the *Brady* issue involving denial of the request for Scott's "rap sheet" has not been fully and fairly presented to the Delaware Courts because the stipulated factual information upon which plaintiff now relies was not before the Supreme Court of Delaware. While it is true that the Supreme Court of Delaware did not have the *Brady* issue before it with the same record currently before this Court, that fact does not in the view of the Third Circuit Court of Appeals mean that there has been a failure to exhaust. In *Hales v. Redman*, 605 F.2d 1195 (3rd Cir.1979), the Third Circuit held that when a habeas corpus petitioner has made the same factual allegations and legal claim before the District Court which he or she has made before the State Courts, and where the petitioner failed to provide a satisfactory record in the State Courts in support of his claim because the trial court applied a legally erroneous standard, prosecution of the claim through an unsuccessful appeal is all that is necessary to exhaust State remedies. I find the *Hales* case indistinguishable from the one now before me. If anything, this case is a stronger case from petitioner's point of view because of his request to the Supreme Court that he be allowed an opportunity to develop a satisfactory record on remand to the trial court.

## II. THE BRADY ISSUE.

A number of courts have held that where a State prosecutor has access to, though not possession of, an FBI "rap sheet" which turns out to have material information helpful to the defense, a failure to honor a specific defense request for that sheet violates the Due Process Clause. *Briggs v. Raines*, 652 F.2d 862 (9th Cir.1981); *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980); *State v. Humphrey*, 217 Kan. 352, 537 P.2d 155 (1975); *State v. Ireland*, 11 Or.App. 264, 500 P.2d 1231 (1972). I assume for present purposes that the Third Circuit Court of Appeals would take a similar view. This is not such a case, however.

The only access which the prosecutor in petitioner's case had to an F.B.I. rap sheet on Scott at the time a specific request for it was made was mail access. Since that request was first made at trial, this access was, as a practical matter, no access at all. To hold otherwise would require every court trying a criminal case to recess for a period of days whenever the defendant asks for a rap sheet on the prosecution's witnesses.

For this reason, I believe this is properly viewed as a case in which only a general

request for *Brady* material was made. This is important for two reasons: no court has held that a duty to procure a "rap sheet" exists absent a specific request for one and, even if such a duty exists in a case of this character, the legal standard of materiality is more strict than it would be had a timely, specific request been made.

■ The duty to disclose *Brady* information in a case where a general request is made, as in one where there is no request at all, arises only when there is evidence which the prosecutor knows or clearly should know is exculpatory. As the Supreme Court observed in *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976):

> If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made....

■ In petitioner's case, no one associated with his prosecution knew whether or not an F.B.I. rap sheet on Scott existed or, if it did, whether it contained anything helpful to petitioner's defense. In such a situation, there is no "notice of a duty to produce".

■ It is true that a duty to produce *Brady* material exists even where the prosecutor has overlooked the exculpatory evidence in his file and therefore has no subjective awareness of it. Due process in this context requires him to know what is in the State's files. It requires a substantial expansion of this principle, however, to hold that a prosecutor has a duty to know whatever is known by any person or agency which would be willing to cooperate upon request. I conclude that due process does not impose such a burden on State prosecutors.

■ Assuming, however, that petitioner's prosecutor improperly refused to secure and provide the F.B.I. rap sheet, it would not follow that petitioner's right to due process has been violated. Petitioner has the burden of showing that the withheld evidence was material, that is, that it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402. I conclude that petitioner has not met this burden.

It is true, as petitioner stresses, that the jury was required to decide whether to believe Scott and Pruden's testimony or petitioner's alibi evidence. Scott's credibility was thus an important issue. There is no reason to believe, however, that the resolution of that issue would have been any different if the jury had known that Scott had been convicted eight years earlier of assaulting a police officer. This evidence, in the context of petitioner's case, was both cumulative and of slight probative value. The crime Scott committed was removed in time and did not involve dishonesty, deception or false statements.[3] More importantly, it must be kept in mind that the jury believed Scott and Pruden beyond a reasonable doubt despite the fact that Scott admitted on the stand that (1) he had initially tried to mislead the police, (2) that he committed perjury during his direct testimony, and (3) that he was dealing in drugs at the time of the events giving rise to the charges against petitioner. In this context, one can say with some confidence that the alleged *Brady* material did not create a "reasonable doubt that did not otherwise exist" and was, therefore, not material.

## III. THE ADMISSION OF PETITIONER'S ORAL STATEMENTS.

■ Certain oral statements made by petitioner while in custody were admitted at his trial. He objected to their admission on the ground that they had been made prior to his being properly advised of the charges against him and after he had asked to see an attorney. This objection resulted in an

---

**3.** The limited probative value of Scott's prior conviction is reflected in the fact that it would

not be admissible under Rule 609(a) of Delaware's present Uniform Rules of Evidence.

evidentiary hearing outside the presence of the jury and factual findings by the trial judge based thereon. The trial judge concluded that petitioner had been advised of the charges against him and had been given his *Miranda* warnings prior to making the oral statements. He further concluded that the most likely inference from the evidence was that the statements admitted into evidence at trial had been given before the request to see an attorney. Since there is no claim that petitioner was not permitted a fair opportunity to develop the record in this voir dire proceeding, I am constrained to accept these factual findings. 28 U.S.C. § 2254(d). It follows that petitioner's right against self-incrimination was not violated by the admission in evidence of his oral statements to the detectives following his arrest.

## IV. THE PROSECUTOR'S COMMENT DURING REBUTTAL.

At trial, it was the State's theory that petitioner and his co-defendant, Harley, gambled together frequently in the area of Taylor and Bennett Streets, that Harley had made a drug buy at the McDaniel house earlier in the day on the date of the alleged crime, and that the two of them had planned a robbery at that house in the belief that they would find the proceeds of a drug business there. In closing argument, petitioner's counsel pointed out that the State had produced no witnesses from the Taylor and Bennett Streets neighborhood to testify that petitioner and Harley gambled together there despite the fact that people from that neighborhood had been interviewed by police. He urged the jury to draw the inference that their testimony would have been favorable to petitioner. In this context, the prosecutor made the following statements during his rebuttal remarks:

> Oh, we haven't brought in, again, people from the streets to show that Boyer and Harley knew each other. Well, if you have the house, the McDaniel house, and you have Theresa McDaniel knowing Boyer, and you have Harley knowing Theresa McDaniel, and you have a bur-

glary and a robbery taking place in the McDaniel house, and Boyer and Harley converging together in the getaway car, and nothing on the part of the defense to rebut those two knowing each other, well, you take the evidence for what it would be and draw your own conclusions as to that.

■ Petitioner argues that the reference to an alleged failure of the defense to rebut the alleged relationship between the two defendants constituted a prejudicial and unconstitutional comment on the failure of the defendants to take the stand. He asserts that the only effective evidence as to the absence of any relationship between the two would be denials by the persons involved, and that the prosecutor's remark therefore was a direct reference to the failure of the defendants to testify. There was, however, no objection to or protest of the prosecutor's remark at trial. Even in the absence of such an objection, however, the trial court, during its charge a few minutes later, instructed the jury that "the law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised and no inference of any kind may be drawn from the decision not to testify."

In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that the Fifth Amendment prohibits the court and prosecutor from commenting on a defendant's failure to testify. *Griffin* involved direct comment by the prosecutor on the defendant's refusal to testify, as well as instructions to the jury that they could consider failure to testify as tending to indicate the truth of the evidence against the defendant. Comments by the court or prosecutor need not be direct, however, to be unconstitutional; the test of whether language used is unconstitutional is whether it was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Bontempo v. Fenton,* 692 F.2d 954, 959 (3d Cir.1982); *United States v. Chaney,* 446 F.2d 571, 576 (3d Cir.1971).

Questions or remarks about the absence of facts in the record need not be taken as comment on the defendant's failure to testify. *Bontempo, supra,* at 959. *See Braxton v. Estelle,* 641 F.2d 392, 396–7 (5th Cir. 1981).

While testimony by petitioner that he did not know Harley would have been one way to counter this portion of the government's case, it was clearly not the only way. Petitioner's mother, for example, who did testify as to his habits and friends, might have testified that she had never seen Harley, if that had been the case, and the gamblers at Taylor and Bennett were also accessible to the defense. In light of these other possibilities and the context of the prosecutor's remark, I think it highly unlikely that the jury understood him to be referring to petitioner's failure to testify. Indeed, if that had been the message actually communicated in the courtroom, petitioner's counsel, who had already interrupted the rebuttal on one occasion, would surely have objected. Therefore, the prosecutor's remark did not violate petitioner's Fifth Amendment rights.

## V. THE DOUBLE JEOPARDY CLAIM.

Petitioner contends that the trial court erroneously sentenced him separately for attempted murder and possession of a deadly weapon during the commission of that felony. His argument is answered by *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).[4] His sentences did not subject him to double jeopardy.

## VI. PETITIONER'S OTHER CLAIMS.

Petitioner makes four other attacks upon his indictment, the trial court's treatment of alleged hearsay evidence, and the court's instructions to the jury. I find each to be without merit, either because no error was committed or because no violation of federal constitutional law is involved. In particular, I have reviewed the trial court's instruction to the jury in their entirety and find that they effectively communicated to the jury the concept that it was the State's burden to prove the defendants' guilt beyond a reasonable doubt.

## VII. CONCLUSION.

For the foregoing reasons, the petition for a writ of habeas corpus will be denied.

---

**4.** I agree with the analysis of *Albernaz* found in the opinion of the Supreme Court of Delaware in *Hunter v. State,* 430 A.2d 476 (Del.Supr. 1981).