IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ZACHARY SCHAFFER, | § | |
| | § | No. 238, 2017 |
| Respondent Below, | § | |
| Appellant, | § | Court Below: Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | No. 1605005875 |
| STATE OF DELAWARE, | § | |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: January 24, 2017
Decided: April 10, 2018

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

## **O R D E R**

This 10th day of April, 2018, having considered the briefs, the record below, and the argument of counsel, it appears to the Court that:

(1)     In April 2016, a sixteen-year-old high school student died after being attacked by another student in a school bathroom. She died not of blunt force trauma from the attack, but from a rare, undiagnosed heart condition that was aggravated by the emotional and physical stress of the attack. Schaffer,[1] the appellant here, was not the perpetrator, but she was charged in Family Court with conspiring with the perpetrator and a third student to assault the victim. After a

---

[1]     Schaffer is a pseudonym, assigned because she was tried in Family Court as a juvenile. *See* Del. Sup. Ct. R. 7(d). The names of all other juveniles in this order are also pseudonyms.

bench trial, the Family Court adjudicated Schaffer delinquent of conspiracy in the third degree.

(2) Schaffer challenges her delinquency adjudication on three grounds. First, she contends that the State violated her due process rights under the United States and Delaware constitutions by failing to recover an iPad that the school had issued to the victim, which Schaffer believes may have contained information favorable to her defense. Second, she contends that the trial judge erred by allowing the State to introduce two Snapchat videos that the State attributed to her without adequate authentication. Third, she contends that the evidence as a whole was insufficient to support the Family Court's finding that she was delinquent of conspiracy in the third degree.

(3) We recently examined these events in connection with the charges against the student who perpetrated the attack, Tracy Cannon.[2] We focus here on Schaffer's role.

(4) The day before the fatal attack, the victim, Alcee Johnson-Franklin, left class to meet Schaffer and Cannon in one of the school bathrooms. A feud had been brewing on social media between Cannon and Johnson-Franklin, and a faculty member who was near the bathroom reported hearing "a lot of screaming

---

[2] *See Cannon v. State*, ___ A.3d ___, 2018 WL 1097023 (Del. Mar. 1, 2018).

and a lot of verbal talk."[3] At trial, the State offered—and the court admitted—a short video of the confrontation, which Schaffer had allegedly recorded and posted on Snapchat. The video had a caption, which read, "[Cannon] bouta fight her." The State also offered a second video that Schaffer allegedly posted, which consisted of her, Cannon, and a third student walking down a hallway, during which could be heard, "We gonna get her. She's scared."

(5) That night, Johnson-Franklin talked with a friend about the incident by both text message and a video call. The next morning, Schaffer, Cannon, and the third student from the video were all seen together in the school cafeteria prior to class. At trial, another student testified that, as she was on her way to school that morning, she received a call from that third student from the video, who asked her if she had arrived at school yet, and if she knew where to find Johnson-Franklin.

(6) When Johnson-Franklin arrived at school, she passed by Schaffer, Cannon, and the third student before walking into the same bathroom as the day before. The three girls followed her. After an exchange of words between her and Cannon, Cannon attacked her. A video taken by another student captured the attack, which lasted only about a minute. Cannon "pulled [her] to the ground, threw a quick succession of awkward punches, pulled her by her hair, and then

---

[3]    App. to Opening Br. A-6.

jumped on top of her. By the end, the two of them were on the floor, grappling and kicking at each other until other students pulled them apart."[4]

(7)    Soon after, Johnson-Franklin went into cardiac arrest, and less than two hours later, she was pronounced dead. Her autopsy revealed that she had suffered from a rare heart condition, which she had not known that she had. "The cause of her death was found to be 'sudden cardiac death due to [a] large atrial septal defect and pulmonary hypertension,' with the emotional and physical stress from the assault acting as a 'contributing' cause."[5]

(8)    The State filed delinquency petitions against Cannon, Schaffer, and the third student. All three were charged with conspiracy in the third degree, and Cannon—the perpetrator of the attack—was further charged with criminally negligent homicide. The Family Court adjudicated Schaffer and Cannon delinquent of conspiracy and further adjudicated Cannon delinquent of criminally negligent homicide. The third student was found not delinquent.

(9)    During the investigation into Johnson-Franklin's death, investigators learned that the school had issued iPads to all of its students. But while they were able to locate the iPads of Cannon, Schaffer, and the third student, they were unable to locate Johnson-Franklin's. According to one of the detectives who investigated her death, they would have "love[d] to have [it]," but they never

---

[4]    *Cannon*, 2018 WL 1097023, at *7.
[5]    *Id.* at *3.

4

recovered it.[6] They asked Johnson-Franklin's family if they knew where to find it, but they did not. A detective on the investigation team asked the school whether they had the capability to remotely track the location of the school-issued iPads, but the detective who testified at trial did not know what came of that discussion. The detective did mention, based on his knowledge of the tracking technology—in this case, Apple's "Find My iPhone" feature—that it would work only if the iPad's battery was charged and the device was powered on. A faculty member who testified at trial confirmed that the school did have that ability to remotely track the students' iPads, but she too did not know whether any attempts had been made to use that technology to locate the missing iPad. She also suggested that the school may have had some ability to remotely monitor how the students were using their iPads, but said that they could not "necessarily go into their iPad."[7]

(10)  At trial, Schaffer argued that the State's failure to locate and turn over the iPad violated her rights under *Brady v. Maryland*,[8] which requires the State to turn over evidence favorable to the accused that is within the State's possession or control, and our decisions in *Deberry v. State*[9] and *Lolly v. State*,[10] which, as a matter of the due process guarantee of the Delaware Constitution, require the State

---

[6]     App. to Answering Br. B-79.
[7]     App. B-105.
[8]     373 U.S. 83 (1963).
[9]     457 A.2d 744 (Del. 1983).
[10]    611 A.2d 956 (Del. 1992).

5

to "gather [and] preserve" such evidence.[11] Schaffer speculated that the iPad may have contained evidence—in the form of text or video conversations—showing that Johnson-Franklin was just as willing to fight Cannon as Cannon was to fight her, which, Schaffer reasons, would disprove that she and Cannon had conspired to assault her.[12] Evidence the State was able to obtain of conversations Johnson-Franklin had with one of her friends the day before the attack through data recovered from the friend's device (and the friend's recollection of the conversation) gave no indication that Johnson-Franklin had been willing to fight, but Schaffer speculated that the missing iPad might contain evidence of other conversations that would show otherwise. As a remedy for the State's failure to locate and turn over the iPad, Schaffer asked the Family Court to infer that it would have contained evidence favorable to her defense.

(11)   The Family Court denied her request, reasoning that the State's duty to gather and preserve potentially favorable evidence does not extend so far as to require the State to search for evidence whose whereabouts are unknown—under penalty of a negative inference if it does not do so with sufficient diligence:

> The defendant seeks to hold the State responsible for finding something that was not found and doing so under the theory that the

---

[11]    *Id.* at 960.

[12]    *See* 11 *Del. C.* § 452 ("In any prosecution for an offense involving or threatening physical injury, it is a defense that the victim consented to the infliction of physical injury of the kind done or threatened, provided that . . . [t]he physical injury done or threatened by the conduct consented to is not serious physical injury . . . ."). As we will discuss in greater detail, we express no opinion on the merits of Schaffer's line of reasoning.

State had an obligation to find it . . . . That is, [that] the State did not find that which, with proper investigation, not only could but would have been found. And I cannot agree with that . . . . This is not a situation where the State retrieved something or knew where it was and that it has disappeared.[13]

(12)   *Deberry* and *Lolly*'s directive that the State must gather and preserve potentially favorable evidence, and *Brady*'s directive that the State must turn it over, together form "what might loosely be called the area of constitutionally guaranteed access to evidence."[14] But while these two directives work together to "protect[] the innocent from erroneous conviction and ensur[e] the integrity of our criminal justice system,"[15] they deal with "two distinct universes" of State conduct—*Brady* being concerned with the evidence that is in the State's possession or control, and *Deberry* and *Lolly* being concerned with evidence that, because of the State's wrongful failure to gather and preserve it, is not.[16]

(13)   We can therefore dispense at the outset with Schaffer's contention that the State's failure to locate and turn over the iPad ran afoul of *Brady*. *Brady* applies only to evidence in the prosecution's possession or control,[17] which the

---

[13]    App. B-202.

[14]    *See California v. Trombetta*, 467 U.S. 479, 485 (1984) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).

[15]    *Id.*

[16]    *United States v. Femia*, 9 F.3d 990, 993 (1st Cir. 1993) (discussing the federal due process analogs to *Deberry* and *Lolly*).

[17]    *See Lavallee v. Coplan*, 374 F.3d 41, 43 (1st Cir. 2004) ("[E]xculpatory or impeaching evidence is so-called '*Brady* material' only if it is within the government's custody, possession, or control."); *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997) ("*Brady* . . . does not require a prosecutor to provide evidence that she could not reasonably have had knowledge of or

7

iPad was not. It is true that the concept of "control" is generally understood to be broad enough to reach evidence outside of the prosecution's possession if the prosecution (or a member of the investigative team) has knowledge of and "ready access" to it,[18] but the prosecution did not have ready access to an iPad whose present whereabouts were unknown. Schaffer contends that the prosecution had control over the iPad all along because of possibility that the school could track its location, but even if all the conditions on the iPad's end were ripe for it to be tracked, the school would have been able to—at best—give investigators a potential area to search. Hollywood portrayals aside, electronic devices cannot always be tracked with pinpoint precision,[19] so even if the iPad responded to the school's efforts to track it, there still may have been more searching to do (and,

---

control over."); *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 824 (9th Cir. 1985) ("[T]he prosecution must disclose any information within the possession or control of law enforcement personnel . . . ."); *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975) (recognizing that *Brady* does not extend to materials that the government does not possess and has "no right to or control over").

[18]    *United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977) (rejecting a *Brady* claim for materials over which the prosecutor did not have "ready access"); *accord United States v. Reyeros*, 537 F.3d 270, 281–82 (3d Cir. 2008) (recognizing that whether evidence falls within the scope of *Brady* turns on in part on whether the prosecution "has 'ready access' to the evidence"); *see Boyer v. State*, 436 A.2d 1118, 1126–27 (Del. 1981) ("If the State either has in its actual possession or has access to the F.B.I. criminal records of witnesses for the prosecution, *Brady*, of course, would mandate disclosure of those records . . . .").

[19]    *See* Apple Inc., *Get Help with Find My iPhone*, https://support.apple.com/en-us/HT204233 (Dec. 21, 2017) (cautioning that a device's "location circle"—the area on a map in which the device reports that it is located—may be "too large to be useful" if the device does not have access to a wireless internet or GPS signal); *Jones v. United States*, 168 A.3d 703, 735–36 (D.C. 2017) (recognizing that while "case law is replete with references to iPhone owners or law enforcement officers locating stolen iPhones by using the Find My iPhone app," "[t]he facts caution against assuming that the Find My iPhone app or similar find-my-device apps always pinpoint an address or do so accurately").

depending upon where it turned up, warrants to obtain). In the end, that all may have worked, but as anyone who has lost a phone would likely agree, being able to see a spot on a map where the missing device might be is not the same as having "ready access" to it.

(14) For that same reason, we can also dispense with Schaffer's contention that the State's failure to turn over the iPad violated the State's discovery obligations under Family Court Rule of Criminal Procedure 16. That Rule—like its Superior Court counterpart—requires the State to produce, upon request, items material to the preparation of the accused's defense. But, as with *Brady*, it applies only to materials that "are within the possession, custody or control of the State."[20]

(15) The real thrust of Schaffer's argument is not that the State failed to give her access to an iPad that it had, but that the State did not do enough to track it down and preserve it. That argument is governed by *Lolly* and *Deberry*, not Rule 16 and *Brady*.

(16) In *Deberry*, we held that the State has a duty to preserve evidence that is potentially favorable to the accused,[21] and in *Lolly*, we held that Delaware's due

---

[20] Del. Fam. Ct. R. Crim. P. 16(b); *see United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989) (equating the reach of federal Rule 16, which likewise requires the government to produce materials in its "possession, custody, or control," to *Brady*); *United States v. Libby*, 429 F. Supp. 2d 1, 10 (D.D.C. 2006) ("[T]he possession, custody, or control analysis under *Brady* is identical to the analysis under [federal] Rule 16.").

[21] *Deberry*, 457 A.2d at 751–52.

process guarantee also imposes a duty on the State to gather it.[22] Both of these duties safeguard the accused's right of access to potentially favorable evidence under *Brady* and Rule 16. As we have recognized, "[o]nly if evidence is carefully preserved during the early stages of investigation will disclosure be possible later."[23]

(17) The duty to preserve evidence, under *Deberry*, stems from the obvious concern that, if there were no duty to preserve evidence that comes into the State's possession, "disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence."[24] The justification for a constitutional duty to gather, under *Lolly*, is not as immediately apparent. But it too flows naturally from the State's duty, under *Brady* and Rule 16, to disclose. As we have observed, the duty to disclose does not stop with evidence in the prosecution's possession; it can reach even evidence outside the possession of the prosecution if that evidence is known and readily accessible. But if the State has no duty to gather, evidence that was known and readily accessible to the prosecution at one time or another during the investigation—like the blood observed at the crime scene in *Lolly*—may no longer be readily accessible or even in existence by the time of trial. A duty to preserve with no duty to gather would safeguard the

---

[22]     *Lolly*, 611 A.2d at 960.
[23]     *Deberry*, 457 A.2d at 751.
[24]     *Id.*

10

accused's right of access to evidence in the State's possession while leaving unguarded the right, under *Brady* and Rule 16, to evidence outside of the State's possession that the prosecution knows about and has ready access to. The duty to gather, then, ensures that the full sweep of the accused's rights under *Brady* and Rule 16 are protected.

(18)   But just as the scope of *Brady* and Rule 16 justifies a duty to gather, so too does it suggest its limits. A duty to gather evidence that investigators know about and have ready access to can be comfortably squared with the prosecution's duty to disclose known and readily accessible evidence, but as the duty to gather extends beyond those bounds, it becomes more tenuous.

(19)   Our cases bear that out. We have faulted the State for failing to gather evidence that it knew of and had ready access to during an investigation, like blood observed at a crime scene,[25] cigarette butts lying near a victim's body,[26] or clothing concealing firearms,[27] but we have not when the evidence in question was further afield, like surveillance videos in the hands of private parties or information from a victim's social media account.[28]

(20)   This understanding of the limits on the duty to gather evidence ensures that it does not grow into a more expansive (and burdensome)

---

[25]    *Lolly*, 611 A.2d at 960–61.
[26]    *Hughes v. State*, 569 A.2d 81, 88 (Del. 1989).
[27]    *Johnson v. State*, 27 A.3d 541, 547 (Del. 2011).
[28]    *Williams v. State*, 100 A.3d 1022, 2014 WL 4179121, at *3 (Del. 2014) (unpublished table decision).

11

constitutional imperative "to seek [it] out."[29] And that distinction is dispositive here. Schaffer faults the State for not making use of the school's tracking abilities to help it recover the missing iPad,[30] but while investigators had hoped to find it, the iPad was never, as we have observed, readily accessible to them. So even if the State neglected to avail itself of the school's tracking abilities as part of its search, recovering the iPad did not fall within the scope of its duty to gather evidence. As such, the State's failure to find it and turn it over did not violate Schaffer's rights under the Delaware Constitution.

(21) Schaffer's second contention is that the Family Court erred by allowing the State to introduce evidence of two Snapchat videos that the State said she had taken. The videos were key evidence bolstering the State's theory that Schaffer had conspired with Cannon to assault Johnson-Franklin—especially the second video, which bore a caption that read, "We gonna get her. She's scared." Schaffer contends that the State did not present evidence sufficient to authenticate the videos. We disagree.

---

[29]     *Mason v. State*, 963 A.2d 139, 2009 WL 189839, at *1 (Del. 2009) (unpublished table decision).

[30]     Because the detective who testified did not know what came of the discussions the other detective had with the school about trying to track the iPad, the record is unclear whether the iPad could not be remotely located or whether the police simply did not follow up on this lead. But that gap in the record does not inure to the State's benefit. *See Deberry*, 457 A.2d at 752 ("The State must justify the conduct of the police or prosecutor, and the defendant must show how his defense was impaired by the loss of the evidence.").

(22)    It is an "inherent logical necessity" that evidence should not be admitted unless the party offering it can show that the evidence is what it is claimed to be.[31] That requirement is codified in Delaware Rule of Evidence 901, which requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is."[32]

(23)    But while the authentication requirement is fundamental, it imposes only a "lenient burden"[33] that is "easily met."[34] The proponent need not conclusively prove the evidence's authenticity, but merely provide a "rational basis" from which a reasonable finder of fact could draw that conclusion.[35] And there are no hard-and-fast rules about how that must be done.  The proponent can point to "witness testimony, corroborative circumstances, distinctive characteristics," or other evidence probative of authenticity.[36]

(24)    We review a trial court's evidentiary rulings only for an abuse of discretion.[37] There was no abuse of discretion here. At trial, two witnesses—both classmates of Schaffer—testified about the videos. Both of them were friends with

---

[31]    7 John Henry Wigmore, Evidence in Trials at Common Law § 2129 (James H. Chadbourn rev., 1978)
[32]    D.R.E. 901(a).
[33]    *Guy v. State*, 913 A.2d 558, 564 (Del. 2006) (*Whitfield v. State*, 524 A.2d 13, 16 (Del.1987)).
[34]    *Cabrera v. State*, 840 A.2d 1256, 1264–65 (Del. 2004)
[35]    *Id.*
[36]    *Parker v. State*, 85 A.3d 682, 687–88 (Del. 2014) (rejecting imposing a heightened authenticity requirement—or other special requirements—to evidence of social media posts).
[37]    *Id.* at 684.

Schaffer on Snapchat, which means that they would be able to view photos and videos posted from Schaffer's account, and one testified that she had seen photos and videos Schaffer had posted from that account in the past. That same witness testified that both of the videos in question had been posted to Schaffer's account, and when the two videos were played in court, the witness confirmed that they were the videos that Schaffer had posted. The other witness recalled having seen one of the videos posted to Schaffer's account—the video bearing the caption "We gonna get her. She's scared"—and specifically remembered the video having made reference to Johnson-Franklin being "scared."[38]

(25)  Schaffer takes issue with the fact that the witnesses could not remember exactly when they watched the videos and that the first witness did not specifically mention the text in the captions of the videos (even though the second witness did).[39] She also points to the fact that videos introduced at trial did not have time stamps on them, even though the first witness testified that when a Snapchat video is played back through the platform, it bears a time stamp until that video is deleted from the posting user's account.

(26)  None of those contentions show that the Family Court abused its discretion. The fear with social media evidence is that it "could be faked or

---

[38]  *See* App. B-54 ("[T]here was a video of them, [Schaffer] and [Cannon], saying that she was scared . . . .").

[39]  That may have been due to the fact that Schaffer's counsel objected immediately after the first witness began to describe the contents of the video, given that, at that point of the trial, the video had not yet been admitted into evidence.

14

forged"—particularly given how easily it can be to create a social media account masquerading as someone else.[40] But here, the State presented a witness who was familiar with Snapchat account that the video was posted from and was able to link that account to Schaffer from having seen photos and videos that Schaffer had posted to that account in the past.[41] And while Schaffer hypothesizes that the videos could have been manipulated after they had been posted to her account to add the captions "[Cannon] bouta fight her" and "We gonna get her. She's scared," the State's first witness confirmed that the recordings played back in court were the same videos she remembered watching from Schaffer's account, and the State's second witness recalled one of those captions from memory.

(27) The fact that the witnesses could not remember exactly when they watched the videos does little to undermine their authenticity, and the fact that videos did not have the time stamps that one witness expected to see was simply a fact that the finder of fact could weigh in deciding how much evidentiary weight to give to the videos. As we have said, a link between the proffered evidence and its source "need not be conclusive" to pass muster under Rule 901.[42] As long as the

---

[40]     *Parker v. State*, 85 A.3d 682, 685 (Del. 2014).
[41]     *Cf. United States v. Vayner*, 769 F.3d 125, 132 (2d Cir. 2014) ("It is uncontroverted that information about [the defendant] appeared on the [VK.com] page: his name, photograph, and some details about his life . . . . But there was no evidence that [the defendant] himself had created the page or was responsible for its contents. . . . [T]he mere fact that a page with [the defendant's] name and photograph happened to exist on the Internet . . . does not permit a reasonable conclusion that this page was created by the defendant or on his behalf.").
[42]     *Cabrera*, 840 A.2d at 1265.

proponent has supplied a basis to find the evidence authentic—which the State did here—the rest goes to "the appropriate weight to be given the evidence, not its admissibility."[43]

(28) Schaffer's final contention is that there was insufficient evidence for the Family Court to find her delinquent of conspiring to commit assault. "[W]hen a juvenile challenges whether the record supports a finding of delinquency, we ask, just as we would were this an adult criminal case, whether the evidence, viewed in the light most favorable to the State, would permit a reasonable judge of the facts to find 'the essential elements of the crime beyond a reasonable doubt.'"[44]

(29) Schaffer does not contend the evidence was insufficient to show that she conspired with Cannon to attack Johnson-Franklin. Her contention is solely that Johnson-Franklin was a "mutual combatant,"[45] which, in her view, transforms what happened from a criminal assault to a fight between two willing parties and exonerates her from the conspiracy charge. She relies on 11 *Del. C.* § 452, which provides,

> In any prosecution for an offense involving or threatening physical injury, it is a defense that the victim consented to the infliction of physical injury of the kind done or threatened, provided that . . . [t]he physical injury done or threatened by the conduct consented to is not serious physical injury.

---

[43]     *Id.*
[44]     *Cannon*, 2018 WL 1097023, at *1.
[45]     Opening Br. 26.

(30)   Even if Schaffer's theory has merit—a question on which we express no opinion[46]—it had little evidentiary support. She points to the fact that when Johnson-Franklin left class to meet her and Cannon in the bathroom on the day before her death, Johnson-Franklin told a friend in class with her that she "suspected that [the argument] would come to a fight" and asked her friend to keep the classroom door open so that, if a fight broke out, her friend could come to her aid.[47] But on appeal, we read the record in the light most favorable to the State, and that evidence just as much suggests that Johnson-Franklin was afraid of a fight breaking out, not looking to be a part of one. Schaffer also points to the fact that one of Johnson-Franklin's friends testified that just before Cannon attacked Johnson-Franklin, she tried and failed to separate the two of them as they were arguing with each other. Schaffer says that shows that Johnson-Franklin "wanted to continue,"[48] but wanting to continue arguing is not consent to a physical altercation. We find no error in the Family Court's determination that Schaffer was delinquent of conspiracy beyond a reasonable doubt.

---

[46]   *See Potts v. State*, 919 A.2d 562, 2007 WL 646202, at *1 (Del. Mar. 5, 2007) (assuming without deciding that even if § 452 establishes a viable defense to assault where two parties "intended to fight . . . one-on-one," it had no applicability where the victim was "blind-sided . . . [and] attacked with a deadly weapon").

[47]   App. B-56.

[48]   Opening Br. 28.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Family Court be AFFIRMED.

BY THE COURT:

/s/ Gary F. Traynor
Justice