**Ben LOLLY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: May 19, 1992.

Decided: July 27, 1992.

Rehearing Denied Aug. 27, 1992.

Nancy Jane Perillo (argued), Asst. Public Defender, Office of the Public Defender, Wilmington, for appellant.

Gary A. Myers (argued), Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Before VEASEY, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en banc.

WALSH, Justice:

In this appeal from the Superior Court we again confront the question of the evidentiary effect of the State's failure to collect and/or retain allegedly exculpatory evidence. The State argues that we should abandon the analysis crafted by our rulings in *Deberry v. State*, Del.Supr., 457 A.2d 744 (1983) and *Hammond v. State*, Del. Supr., 569 A.2d 81 (1989) in favor of a standard which turns on the good faith of the police, as exemplified in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). We reaffirm our adherence to the more exacting standard based on Delaware constitutional norms and conclude that the Superior Court erred in instructing the jury on the effect to be accorded missing evidence in this case. Accordingly, we reverse appellant's conviction and remand for a new trial.

I

The appellant, Ben Lolly ("Lolly"), was convicted following a jury trial in the Superior Court of Burglary Second Degree, Misdemeanor Theft and Criminal Mischief. The charges arose out of an incident which occurred at the apartment of Lolly's former girlfriend on November 10, 1989. The evidence presented at trial depicted the following events. On the night in question Fulton Hutchinson ("Hutchinson") was watching television in the apartment of his girlfriend, Karen Butler ("Butler"). Hutchinson was scheduled to pick up Butler after she finished work at 9:30 p.m.

At approximately 8:00 p.m. the appellant Lolly knocked on the door of the apartment, asking for Butler. Lolly had been Butler's previous boyfriend but had broken up with her five months earlier. Hutchinson told Lolly that Butler was not at home. Lolly left but returned a short while later, again asking for Butler. Hutchinson again informed him Butler was not there.

When Hutchinson left the apartment at 9:30 p.m. to retrieve Butler, Lolly approached him on the street and once more asked if Butler was home. Hutchinson responded that she was not and left to pick up Butler. Although he had encountered

Lolly three times that evening, Hutchinson testified at trial that Lolly seemed "normal."

Butler and Hutchinson returned together approximately ten minutes later. While Hutchinson was parking the car, Butler walked to the apartment but was approached by Lolly before entering the building. She noticed that Lolly's hand was wrapped in a blood soaked towel. After a brief exchange regarding their prior relationship, Butler was rejoined by Hutchinson, and the two of them entered the apartment.

Once inside, the couple found that the apartment had been ransacked. However, the only items missing were Butler's high school diploma and a picture of her aunt.

The burglar's point of entry [1] was a back window. In the previous few months, Butler's apartment had been broken into a number of times. Each time, the burglar came through the back window by breaking it. To prevent this from happening again, Butler had booby-trapped the window with a razor-knife and sharpened sticks. The intruder on November 10 had evidently been caught in the trap as there was a small pool of blood near the window. The trap also explained the blood splattered throughout the apartment. Butler immediately suspected Lolly of the crime and requested Hutchinson to call the police from a neighbor's phone.

Officer Cynthia Dodson ("Dodson") arrived at the apartment within a few minutes of the call. As she was interviewing the couple in the apartment, a loud crash was heard. From the window, Dodson saw a brick bounce off Butler's car and a man running down the street. Butler also saw the man and identified him as Lolly. Dodson immediately radioed for assistance and broadcasted a description of the fleeing man. A few minutes later Lolly was stopped five blocks away by a police unit because he fit the description broadcast by

Dodson. Lolly was holding a rag to a bleeding wound on his hand. When he was taken back to the crime scene, he was identified by both Dodson and Butler as the man they saw running down the street. He was then arrested for the break-in of Butler's apartment.

As noted above, blood splattering was found throughout the apartment, including a small pool near the broken window. Blood was also found on the fire escape outside the window and in the alley below. The trail of blood in the alley led around the building to the spot where Lolly had approached Butler. From there, the trail led to Butler's car, which was also found to have blood smeared on it.

Blood was also found in the back of the patrol car which had transported Lolly back to the crime scene. At trial, the officer who stopped Lolly testified that Lolly's hand was dripping blood when the officer apprehended him. Dodson also testified that when Lolly had been brought back to the scene she specifically looked at his hands and noted that they were so covered in blood that she could not tell where the wound was.

Despite the significance of the blood as evidence of the crime, the police failed to collect any sample for use at trial,[2] even after Lolly told the police he had cut his hand earlier in the day.

Lolly testified in his own defense at trial and denied breaking into Butler's apartment. He also denied that the blood found in the apartment was his. He claimed he had cut his hand earlier that morning while laying carpet at his mother's house and his mother corroborated that claim. He contended that the identification of him as the fleeing man was simply mistaken and suggested that the description fit a great number of people who live in the area of Butler's apartment.

At the conclusion of the evidence, counsel for Lolly requested that the jury be

---

**1.** The same window was also used for egress since the doors to the apartment required a key to open from either side.

**2.** Officer Dodson requested an evidence detection officer to photograph the blood stains and to attempt to lift fingerprints. The photographs were not taken and the fingerprint lifts proved of no value.

given a special instruction that "because of the failure of the police to take and preserve evidence the jury must assume that the evidence, if available, would have been exculpatory or pointed towards the defendant's innocence."[3] After hearing argument by counsel, the trial judge concluded:

> In this case we have the police either making a judgment or acting negligently not to gather evidence. In my view the blood samples were important evidence in this case because that is the issue of evidence that connects this defendant to the burglary."

The court ruled, however, that it would not instruct the jury in the language proposed by Lolly but opted in favor of the following instruction which it subsequently gave:

> If you find that the State negligently failed to carry and gather and preserved blood samples from Karen Butler's apartment, photographs of the apartment, and no other evidence that (sic) a substantial probative value exists with regard to the identity of the person who entered her apartment, or the condition of the apartment, you may infer that such blood samples and photographs would be exculpatory, and therefore, favorable to the defendant.

Counsel for Lolly objected to the court's instruction on the ground that the preliminary determination of negligence was one to be made by the court, not the jury, and that the instruction permitted the jury to find an exculpatory inference only in the absence of other substantial probative evidence of identity.

## II

■ Lolly contends that the instruction given by the trial court in this case failed to comply with the standards for measuring the evidentiary impact of lost or unavailable evidence articulated by this Court in *Deberry*. The State does not take issue with the Superior Court's determination that the police acted negligently in failing to secure blood samples but argues that

the Superior Court applied a practical evidentiary analysis, implicitly sanctioned by this Court, to determine the effect of the missing evidence. In any event, the State contends this Court should abandon the *Deberry/Hammond* analysis in favor of a police bad faith test as the prerequisite for a finding of lack of due process. *See Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

In *Deberry*, this Court ruled that the State, including its police agencies, is obligated to preserve evidence which is material to a defendant's guilt or innocence as a matter of federal and state due process. In fashioning the relief to be afforded a defendant who claims to have been prejudiced by the State's omission, the *Deberry* court fashioned a multi-faceted analysis which, in effect, examines the type of evidence, the conduct of the police, and the significance of the evidence in the context of the total quantum of evidence available at trial. In *Deberry*, and later in *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1090 (1987), we emphasized the need for the State and law enforcement agencies to adopt procedures for the gathering and preserving of evidence that could be favorable to the defendant.

In *Hammond*, we again considered the duty of the State to preserve potentially exculpatory evidence, applying a six part paradigm gleaned from *Deberry* and *Bailey* and specifically focused upon the failure of the trial judge to give a jury instruction concerning the significance of missing evidence consistent with *Deberry*. *Hammond*, 569 A.2d at 86. Although this Court in *Hammond* found the failure to give a *Deberry*-based jury instruction harmless error, we expressly "reaffirmed our prior holdings, pursuant to the 'due process' requirements of the Delaware constitution." *Hammond*, 569 A.2d at 87. Compare *Arizona v. Youngblood*. In *Youngblood*, the United States Supreme Court held that a criminal defendant must show bad faith on the part of the police in

---

**3.** As part of her discovery effort pursuant to Superior Court Criminal Rule 16, counsel for defendant had specifically requested information concerning any blood samples collected at the Butler's apartment. The State responded orally that no such evidence existed.

order to succeed on a denial of due process claim founded upon the failure of police to preserve potentially useful evidence. In *Hammond* we declined to adopt the federal bright line due process test of police bad faith but adhered to the State constitutional underpinnings of *Deberry* where "the conduct of the State's agent is a relevant consideration, but is not determinative." *Id.*

In the present appeal, the State again urges adoption of the federal bad faith standard as the sole test for determining the consequences which flow from the State's failure to gather or preserve evidence. The State's approach to the problem is quite simplistic. If the police deliberately fail to gather or preserve potentially exculpatory evidence, a due process violation is deemed to have occurred and the prosecution is dismissed. Under the State's thesis the focus is on the conduct of the police not the nature of the evidence. This "bright line" test suffers from at least two deficiencies. First, under a bad faith standard the defendant is required to prove that the police were: (1) aware of the significance of the evidence in question (2) under an acknowledged duty to gather or preserve such evidence and (3) deliberately refused to perform their duty. The practical difficulty in proving these elements is obvious. Short of an admission by the police, it is unlikely that a defendant would ever be able to make the necessary showing to establish the required elements for proving bad faith.

Second, where the defendant can make a showing of police behavior which approaches bad faith, the State's bright line test would place the trial court in a difficult position. The court must either find bad faith and dismiss the charges, despite facts which support only a finding of gross negligence, or find no bad faith and deny the defendant the benefit of a favorable inference, despite the loss of material evidence due to the State's negligence. In such a

situation the court is left with an all or nothing proposition leading to two equally unsatisfactory results. The *Deberry/Hammond* approach, on the other hand, allows the court more flexibility in addressing these borderline situations by basing the remedy on a number of factors, including police conduct, taking into consideration the significance of the missing evidence and its relationship to other evidence in the case. The *Deberry/Hammond* due process "totality of the circumstances" approach might actually preserve convictions for the State where the evidence of bad faith presents a close question and the trial judge would have otherwise dismissed the charge.

Although both *Deberry* and *Hammond* involved situations in which evidence once in the possession of the police was not preserved, we believe those holdings are equally applicable to claims involving the alleged failure to gather evidence *ab initio*. *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1049 (1985) (citing *Deberry* ). After consideration of the State's position we continue to adhere to the view that the *Deberry/Hammond* rationale, premised upon State constitutional standards of due process, should continue to control claims of prejudice arising from failure of police to gather or preserve evidence. Under that standard the emphasis, properly we believe, continues to be upon the significance of such evidence in the trial setting with appropriate guidance by the trial judge through jury instruction. We thus turn our attention to the claim in this case that the jury was not properly instructed.

## III

This case differs from both *Deberry* and *Hammond* in two significant respects. First, the trial judge made a specific finding that the police had a duty to collect blood samples and negligently failed to do so.[4] Second, the jury was instructed con-

---

4. The trial judge made the following ruling incident to his granting the defendant's request for a jury instruction on the significance of the missing blood samples:

In this case we have the police either making a judgment or acting negligently not to gather evidence. In my view the blood samples were important evidence in this case be-

cerning the legal significance of the State's failure to collect evidence. Since the State does not here contest the trial judge's determination of police negligence, or the materiality of the missing evidence, those steps of the *Deberry* analysis need not be pursued. We focus therefore on whether the court's instruction served to advise the jury on the probative value of the missing evidence and its relationship to other evidence produced at trial on the identity issue.

■ Once it has been established that the State must bear responsibility for the loss of material evidence, an appropriate jury instruction is required as a matter of due process under the Delaware Constitution. *Hammond*, 569 A.2d at 90. In this case the trial judge determined, as the premise for the granting of a jury instruction, and presumably as a matter of law, both the responsibility of the State and the materiality of the evidence. The instruction drafted by the court, however, permitted the jury to redetermine the factual basis for the court's legal ruling. In instructing the jury that "If you find that the State negligently failed to carry and gather and preserve blood samples ..." the trial judge posed a factual issue for the jury where, under his prior ruling, none existed. In our view this was error.

While situations may arise in which the issue of police responsibility may be the subject of conflicting evidence at trial, thus requiring jury resolution of that dispute, such is not the case here. Although no witness directly testified concerning the usual police practice for collecting blood samples, the State did not take issue with the trial court's determination that there was negligence in the failure to collect samples, nor does it dispute that determination on appeal. Since the trial judge made a legal determination of negligence, it was error to permit the jury to determine whether a factual predicate for that ruling existed.[5]

The instruction was also deficient in making the significance of the missing evidence conditional on the presence or absence of other identity evidence of "substantial probative value." If, as *Deberry* teaches, 457 A.2d at 754, the defendant is entitled to the benefit of an inference that the missing evidence would have been exculpatory, that inference, once established by the trial judge's legal ruling of materiality, may not be further conditioned on the existence or non-existence of other facts in evidence. The inference, however, may be rebutted and it is in that connection that the other evidence has significance. Thus, while the defendant is entitled to an inference that is beneficial on the issue of identity such inference may be dispelled by the other evidence which outweighs the effect of the inference and establishes identity beyond a reasonable doubt. By conditioning the existence of the inference on the absence of other substantial evidence of identity, the instruction deprived the defendant of any inference and thus foreclosed

cause that is the kind of evidence that connects this defendant to the burglary.

In another case the situation might be different, but I would be surprised if Mr. Rhodunda, in his closing argument, didn't talk about the bloodstains in the apartment and the bleeding hand of the defendant.

So in that sense I think that the standard enunciated in DeBury (sic) and Hammond has been violated and the police have acted negligently in failing to gather evidence which is material to the case, and I say that recognizing that the police investigate hundreds, thousands of crimes and the burden of collecting every last bit of evidence on every crime might be significant.

Indeed, as the Trial Judge predicted, the prosecutor, in his summation to the jury emphasized the significance of the blood stains.

Well, ladies and gentlemen, you've heard about the bloodstains, and the bloodstains are very important. There were no examinations done of the blood to determine if, in fact, it was Mr. Lolly or if it wasn't Mr. Lolly. What we have is Mr. Lolly with a bleeding hand. Karen Butler saw it. She saw the blood-soaked towel. Officer Moser picked him up. He had the towel around his hand. He bled all over the police car.

5. In our view the determination of negligence is a matter for threshold determination by the Court, unless there is a genuine factual dispute concerning police procedure. Materiality questions are subject to the Court's plenary power over admissibility of evidence which is relevant, *i.e.*, "of consequence." D.R.E. 401; *Getz v. State*, Del.Supr., 538 A.2d 726, 731 (1988)

the jury's duty to weigh the evidence. In this respect as well it was erroneous.[6]

We recognize that there was significant evidence, apart from the missing blood samples, which linked the defendant to the burglary of Butler's apartment. But, given the trial court's determination of police negligence and materiality, the defendant was entitled to an instruction which accords him a favorable inference based on the missing evidence. The instruction given in this case was clearly deficient and thus deprived the defendant of the process due him under Delaware law. Since the erroneous instruction went to the key issue of identity there is no basis for determining, and the State has not argued, that such error was harmless. Accordingly, the convictions must be reversed and the matter remanded for a new trial.

In view of our reversal and remand for a new trial, it is unnecessary to consider Lolly's claim of plain error in the admission of testimony by Butler that she believed Lolly had ransacked her apartment on previous occasions. The witness' testimony was not solicited by the State and was given in violation of the trial court's *in limine* ruling barring such testimony. In the event of a retrial we assume that the ruling of the trial court will continue to be in force and complied with.

\* \* \*

REVERSED AND REMANDED.

6. Because the issue of the significance of missing evidence is a recurring problem, we recommend that the trial courts, where appropriate, instruct the jury in accordance with the following suggested instruction.

> In this case the court has determined that the State failed to collect/preserve certain evidence which is material to the defense. The failure of the State to collect/preserve such evidence entitles the defendant to an inference that if such evidence were available at trial it would be exculpatory. This means that, for purposes of deciding this case, you are to assume that the missing evidence, had it been collected/preserved, would not have

incriminated the defendant and would have tended to prove the defendant not guilty. The inference does not necessarily establish the defendant's innocence, however. If there is other evidence presented which establishes the fact or resolves the issue to which the missing evidence was material, you must weigh that evidence along with the inference. Nevertheless, despite the inference concerning missing evidence, if you conclude after examining all the evidence that the State has proven beyond a reasonable doubt all elements of the offenses(s) charged, you would be justified in returning a verdict of guilty.