IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEVIN COLEMAN, | § | |
| | § | No. 83, 2022 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No.   2010012644A/B (K) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: October 19, 2022
Decided:    January 3, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED.**

Patrick J. Collins, Esquire, COLLINS & PRICE, Wilmington, Delaware, *for Appellant Devin Coleman*.

John R. Williams, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

A probation officer seized two guns—one a loaded 9mm Ruger, the other a .40 caliber Smith & Wesson—from a backpack recently carried by the defendant, a convicted felon and thus a person prohibited from possessing a firearm. The officer also seized two .40 caliber magazines—one from within the Smith & Wesson, the other loose in the backpack. It was later determined that one of the magazines bore the defendant's fingerprint but no one knows whether the incriminating prints were on the magazine that was in the Smith & Wesson firearm or on the loose magazine.

The defendant asked the trial court to instruct the jury that the officer's failure to note, at the time of the seizure, which of the two magazines was in the weapon constitutes "missing evidence." Under the defendant's preferred instruction, which we often refer to as a *Lolly/Deberry*[1] instruction, the jury would have been told to assume that, had the officer properly noted the respective positions of the magazines when he initially seized them, those positions—either inside or outside the Smith & Wesson—would have tended to prove that the defendant was never in possession of the Smith & Wesson firearm. The trial court would not give the requested instruction and this refusal, the defendant argues, constitutes a due process violation warranting the reversal of his conviction for possession of a firearm by a person prohibited. As explained below, we disagree and affirm the defendant's conviction.

---

[1] *Lolly v. State*, 611 A.2d 956 (Del. 1992); *Deberry v. State*, 457 A.2d 744 (Del. 1983).

I

In June 2020, Devin Coleman, a convicted felon prohibited from possessing a firearm, was released on probation after completing an 8-year prison sentence. Soon after his release, the police began monitoring Coleman's calls through court-approved telephone wiretaps, as part of a joint contraband investigation by the City of Dover Police and the Delaware State Police. At the time, Coleman, a Level III probationer, lived in Room 117 of the Capitol Inn in Dover.[2]

On July 21 and 22, the police listened to Coleman over the wiretap as he discussed guns and drugs. During the calls on July 21, Coleman expressed a desire to purchase firearms,[3] and, the following day,[4] Coleman was recorded telling associate Antwan Campbell, "I spent $1,700 on guns yesterday."[5]

After Coleman made these incriminating statements, he was observed, on the morning of July 22, 2020, carrying a blue backpack into his motel room at the Capitol Inn. A few minutes later, Coleman went outside to take a call from his friend

---

[2] App. to Opening Br. at A370–71.

[3] During the July 21, 2020 calls, Coleman: (i) spoke with an unknown person who told him about handguns for sale, (ii) told his eventual codefendant Marquis Mack that he was going to go look at guns for sale, (iii) told an unknown male that he is going to the place where guns are for sale, and (iv) discussed with Mack the pricing of the guns and that the seller was coming down from Wilmington. *Id.* at A730–37, A739–40, A742–46, A1210.

[4] During the July 22, 2020 calls, Coleman spoke: (i) with an unknown person with whom he attempted to arrange a contraband drug purchase, (ii) with Kendra Lewis and joked that the laundromat does not accept "dope" as payment, and (iii) with associate Antwan Campbell who wanted to purchase a quarter ounce of an unidentified contraband drug and told Campbell that he spent $1,700 yesterday to purchase guns. *Id.* at A835–36, A845, A848.

[5] *Id.* at A1215–17.

Kendra Lewis. Lewis, who then arrived by car, was greeted by Coleman and the two walked back into the motel room together. Shortly after that, probation officer Ricky Porter and two other officers knocked on the door with the intention of conducting an administrative search. Hearing the knock, Coleman looked out the window, and Porter asked him to open the door. Lewis, James Ayers, and Shaketah Giles were also in the room. Coleman did not open the door immediately.[6] Instead, he turned to Ayers, who was moving things around, and asked him, "Yo, you good?" and Coleman then opened the door.[7]

Once inside, Porter and the officers found drugs containing Fentanyl. Porter also located the blue backpack that Coleman was seen carrying into the room within the preceding hour. Inside the blue backpack, Porter found (i) one Ruger handgun with a loaded 9mm magazine inserted, (ii) one Smith & Wesson with an unloaded .40 caliber magazine inserted, and (iii) one spare .40 caliber magazine that was unloaded and loose in the backpack. Porter photographed the items "before handling the weapons."[8]

---

[6] The parties dispute how much time elapsed before Coleman opened the door. On direct examination, Porter testified that Coleman opened the door after "an abnormally long time . . . 45 seconds to a minute." On cross examination, confronted with his investigative report, Porter testified that he wrote the report on the morning of the search and further testified "I've documented it took Coleman several seconds to open the door[.]" *Id*. at A881, A925–27, A930.

[7] *Id*. at A1436.

[8] *Id*. at A897, A943.

During the evidence collection process, Porter removed the magazines from the Ruger and the Smith & Wesson and confirmed that neither weapon's chamber contained a round. Only the 9mm magazine found in the Ruger contained any ammunition. When he seized the .40 caliber magazines, both of which were unloaded and appeared to be "identical,"[9] Porter did not designate which magazine was found in the Smith & Wesson.

Porter delivered the evidence to the Dover Police Department. The items were then tagged and separately photographed. Later, Detective Nolan Matthews, a Dover Police Department crime-scene investigator, lifted three fingerprints from one of the .40 caliber magazines, an examination of which showed that the prints belonged to Coleman, Mack, and Ayers. These were the only fingerprints found that had any identification value.[10] Because no effort had been made when seizing the evidence to differentiate between the two .40 caliber magazines, there was no way to tell which of the .40 caliber magazines the fingerprints were lifted from—the magazine found inside the Smith & Wesson or the one that was loose in the backpack.

---

[9] *Id*. at A941–42.

[10] The analysis revealed no visible fingerprints on either the Smith & Wesson or the Ruger. Fingerprints were found on the 9mm magazine and on one of the bullets in the 9mm magazine, but none produced any identification value. *Id*. at A1010–11, A1024.

5

Based on the wiretap investigation, a Kent County grand jury indicted 29 defendants, including Coleman, on racketeering, drug, and weapons offenses. Separately, Coleman faced additional charges stemming from the search of his motel room, including two charges of possession of a firearm by a person prohibited and one charge of possession of ammunition by a person prohibited. To avoid the prejudice that might attend the jury's learning of Coleman's prior felony conviction and his status as a "person prohibited," the court severed the "person prohibited" charges and held two trials. The same jury heard both cases and much of the separately presented evidence overlapped. To streamline the trial, the first trial was limited to one drug dealing (fentanyl) charge; the State entered *nolle prosequis* as to eight other charges pending against Coleman. The second trial was limited to two charges of possession of a firearm by a person prohibited and one count of possession of ammunition by a person prohibited.

During the first trial, because Porter could not identify which of the two .40 caliber magazines was in the Smith & Wesson firearm when it was seized, Coleman's counsel requested a missing evidence instruction, stating:

> [A]t the time the evidence was out of the control of Mr. Coleman and exclusively in the control of the state . . . there was at a minimum negligence in handling it. I believe that if there is evidence that could potentially have exculpatory value for a defendant and it has been mishandled in a negligent fashion . . . that supports grounds for allowing for the *Lolly-Deberry* type of instruction that there was evidence, there could have been exculpatory value but because of the way it was handled it was no longer there. The jury should be

6

instructed that if the evidence were stamped and it was handled properly that evidence would have been that the fingerprints were found on the magazine that was not in the gun. So at this point in time I'm making an application for a *Lolly* type [or] *Deberry* instruction with respect to that issue to be given [in] the jury instructions for the gun issue.[11]

In response, the court agreed to hear further argument after the evidence was received in the second trial.

Thereafter, the jury found Coleman guilty of the lesser-included offense of misdemeanor possession of fentanyl. Then, in the second trial, after the prosecution rested, the court denied Coleman's application for a missing evidence instruction finding no breach of the State's duty to collect or preserve evidence.

Coleman then testified in his own defense that he was lying when he told Campbell that he had spent "$1,700 on guns."[12] According to Coleman, when he entered the Capitol Inn on the morning of July 22, the blue backpack contained a pair of sneakers. Coleman opined that Ayers had deposited the guns and spare magazine into the blue backpack while Coleman was outside talking on the phone with Lewis in the minutes before the probation officer arrived to conduct the search.[13] He also claimed that he only briefly touched the spare .40 caliber magazine

---

[11] *Id*. at A1279–80.

[12] *Id*. at A1439.

[13] On cross examination, Coleman agreed that his "theory [was] that the guns [went] in the backpack after [he] [told] [Ayers] to get that stuff out of the room." Coleman confirmed that he never saw anybody put anything in the backpack because he was outside at the time in question. *Id*. at A1463–64.

7

on the morning of July 22 when he slid the "clip" across the sink to Ayers and told him to "pick this stuff up."[14]

At the end of the second trial, the jury found Coleman guilty of only one count of possession of a firearm by a person prohibited. Because neither of the counts charging Coleman with possession of a firearm by a person prohibited describes the firearm—that is, neither count identifies the type of firearm Coleman was alleged to have possessed—we do not know whether Coleman was convicted of possessing the Ruger or the Smith & Wesson firearm.

Before Coleman's trials, the State had filed a motion asking the court to sentence Coleman as a habitual offender under 11 *Del. C.* §4214(d). The Superior Court granted the motion at Coleman's sentencing hearing. The court then sentenced Coleman to 29 years of unsuspended Level V time for the possession-of-a-firearm-by-a-person-prohibited conviction and a fine for the drug-possession misdemeanor.

## II

In this appeal, Coleman raises a single issue: he contends that the Superior Court erred by denying his request for a "missing evidence" instruction thereby depriving him of his right to due process. Although Coleman did not tender a draft

---

[14] *Id*. at A1432–33.

8

instruction to the trial court, his reference to *Deberry* and *Lolly* and his briefing in this Court indicate that the jury instruction he favored would have read as follows:

> In this case the court has determined that the State failed to collect/preserve certain evidence which was material to the defense. The failure of the State to collect/preserve such evidence entitles the defendant to an inference that if such evidence were available at trial it would be exculpatory. This means that, for purposes of deciding this case, you are to assume that the missing evidence, had it been collected/preserved, would not have incriminated the defendant and would have tended to prove the defendant not guilty. The inference does not necessarily establish the defendant's innocence, however.
>
> If there is other evidence presented which establishes the fact or resolves the issue to which the missing evidence was material, you must weigh that evidence along with the inference. Nevertheless, despite the inference concerning missing evidence, if you conclude after examining all the evidence that the State has proven beyond a reasonable doubt all elements of the offense(s) charged, you would be justified in returning a verdict of guilty.[15]

Based upon our *de novo* review of the court's ruling,[16] we conclude that, because the evidence whose absence forms the basis of Coleman's argument was not physical evidence subject to production under Superior Court Criminal Rule 16 or *Brady v. Maryland*,[17] the Superior Court's ruling was not erroneous. In short, the *Lolly/Deberry* framework is inapplicable to Coleman's "missing evidence" claim.

---

[15] Opening Br. at 28 (quoting *Lolly*, 611 A.2d at 962 n.6).
[16] *See Hendricks v. State*, 871 A.2d 1118, 1123 (Del. 2005) (applying *de novo* review to the denial of a request to give a "missing evidence" instruction to the jury).
[17] *Brady v. Maryland*, 373 U.S. 83 (1963).

## A

In *Deberry v. State*, a case involving a rape at knife-point, although there was testimony that the police had taken Deberry's clothing as well as the victim's blood-stained clothes, the State was unable to produce Deberry's clothing for testing.[18] That Deberry's clothing had gone missing was problematic because, had Deberry committed the crimes with which he was charged, "the likelihood of [the victim's] blood being found on [Deberry's] clothing was very strong, given the injuries sustained by the victim."[19]  Conversely, the absence of Deberry's blood and the victim's hair on his clothing "would have been material to the issue of guilt since the evidence could have created a reasonable doubt not otherwise present."[20]  Thus, Deberry's clothing "was of obvious relevance."[21]

In response to Deberry's contention that reversible error occurred when the State failed to produce or account for the potentially exculpatory evidence, this Court recognized that the State's duty to disclose evidence under Superior Court Criminal Rule 16(b) also includes a duty to preserve that evidence.[22]  We observed that the government's "obligation to preserve evidence is rooted in the due process

---

[18] This Court believed that there was "little doubt that the State actually had possession of Deberry's clothing at one time and then lost or destroyed it[.]" *Deberry*, 457 A.2d at 749.

[19] *Id.* at 748.

[20] *Id.* at 749.

[21] *Id.* at 748.

[22] *Id.* at 751–52. *See id.* ("[U]nder Superior Court Rule 16(b), a defendant need only show that an item 'may be material to the preparation of his defense' to be discoverable.").

provisions of the fourteenth amendment to the United States Constitution and the Delaware Constitution, article I, section 7."[23] We held further that if the government fails to preserve important physical evidence, a criminal defendant may be entitled to an inference that the missing evidence would have been exculpatory.[24] To aid in determining whether the inference is available, *Deberry* adopted a framework that examines both the conduct of the State and the nature of the missing evidence:[25]

> 1) would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16 or *Brady* [v. *Maryland*, 373 U.S. 83 (1963)]?
>
> 2) if so, did the government have a duty to preserve the material?
>
> 3) if there was a duty to preserve, was the duty breached, and what consequences should flow from a breach?

We explained that, in the final step of the *Deberry* analysis, to determine what consequences should flow from a breach of duty, the trial courts should consider "(1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain

---

[23] *Id.* at 751–52.
[24] *Id.* at 753–54 (When vital "physical evidence . . . is lost or otherwise becomes unavailable through some apparent default of the police, the State bears a heavy burden of overcoming the defendant's claim of prejudice. . . . Because the State must bear the responsibility for the loss, and the defendant therefore enjoys the inference that evidence of the clothing would be exculpatory in nature, in a retrial the State must stipulate that if Deberry's clothing was introduced it would not contain any evidence incriminating him.").
[25] *Id.* at 750.

the conviction."[26]  "This analysis, of course, assumes that the missing evidence might be *exculpatory, i.e.*, that [it is] relevant to a disputed issue."[27]  We have maintained, as we held in *Deberry*, that "[a] claim that potentially exculpatory evidence was lost or destroyed by the State can only be decided after each element of the above analysis has been considered."[28]

Six years after *Deberry*, we decided *Hammond v. State*,[29] a vehicular homicide case in which the defendant, whose defense hinged in part on his claim that he was not the driver, argued that the State's failure to preserve the crash vehicle or to gather evidence from inside the crash vehicle violated his guaranteed right of access to evidence.[30]  Preservation of the crash vehicle was important to Hammond because evidence of fingerprints, blood, or hair on torn clothing in the interior might have supported his defense that he was not the driver.  The crash vehicle might also have been tested for mechanical failure, providing an innocent cause of the accident.  Applying *Deberry*, we concluded that the State breached its duty to preserve important physical evidence by failing to preserve the crash vehicle itself and that

---

[26] *Id.* at 752 (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring)).  *See Bailey v. State*, 521 A.2d 1069, 1091 (Del. 1987) (citing *Deberry*, 457 A.2d at 752).

[27] *McNair v. State*, 990 A.2d 398, 403 n.16 (Del. 2010) (emphasis in original).

[28] *Deberry*, 457 A.2d at 750.

[29] *Hammond v. State*, 569 A.2d. 81 (Del. 1999).

[30] *Id.* at 85.

12

the defendant was entitled to the inference, that if available, the crash vehicle would have contained exculpatory evidence.[31]

In 1992, in *Lolly v. State*, we extended our holding in *Deberry* to "claims involving the alleged failure to gather evidence *ab initio*."[32]  In addition, we held that the State's failure to gather or preserve evidence material to the defense entitles the defendant to an inference that, if such evidence were available at trial, it would be exculpatory.[33]  In *Lolly*, a burglar was apparently injured by a boobytrapped window; after discovering a trail of blood inside and outside of the apartment, the police arrested Lolly based on an eyewitness identification and the fact that he was holding a rag to a bleeding wound on his hand.[34]  Despite the obvious relevance of the blood as evidence connecting the defendant to the crime, the State failed to collect any samples of the blood, even after the defendant told the police that he had cut his hand earlier in the day.[35]  In *Lolly*, we endorsed our rationale in *Deberry* and *Hammond*, adding that the proper emphasis continues to be upon the significance of

---

[31] *Id.* at 89–90.  *See also id.* (denial of jury instruction was harmless error).

[32] *Lolly*, 611 A.2d at 960 (citing *Hughes v. State*, 490 A.2d 1034, 1049 (Del. 1985)).

[33] *Id.* at 961 n.6.  *See Hendricks*, 871 A.2d at 1124 (emphasis in original) ("there may be circumstances when the State failed to [gather or] preserve evidence that was *material* to the defense and the defendant would be entitled to a missing evidence instruction but not a dismissal of the charges.") (citing *Lolly*, 611 A.2d at 961–62).

[34] *Lolly*, 611 A.2d at 958.

[35] *Id*.

the "missing evidence" in the trial setting with appropriate guidance by the trial judge through jury instruction.[36]

## B

As the preceding discussion illustrates, the courts' employment of a *Lolly*/*Deberry* "missing evidence" instruction has been limited to those instances where potentially exculpatory *physical* evidence was either not collected by law enforcement or collected but not preserved during the course of the prosecution. We have faulted the State for failing to gather or preserve physical evidence material to a defendant's guilt or innocence, like clothing worn during an alleged rape,[37] a crash vehicle in a vehicular homicide case,[38] blood observed near a boobytrapped window,[39] or clothing concealing firearms that were the basis of criminal charges.[40] But in this case the physical evidence—the weapons and magazines—was collected, preserved, and available at trial. There simply is no "missing evidence" in the sense that the *Lolly*/*Deberry* line of cases addresses. This conclusion is consistent with the line of cases discussed above, which teach that "[t]he *Deberry* standard only requires that the State adequately gather and preserve *physical* evidence."[41]

---

[36] *Id.* at 960.
[37] *Deberry*, 457 A.2d at 753.
[38] *Hammond*, 569 A.2d at 85.
[39] *Lolly*, 611 A.2d at 958
[40] *Johnson v. State*, 27 A.3d 541, 547 (Del. 2011).
[41] *Ruffin*, 131 A.3d at 308 (emphasis added) (citing *Deberry*, 457 A.2d at 751–52).

14

As previously noted, the threshold inquiry under *Deberry* is whether, had it been collected, the evidence would have been subject to disclosure under Rule 16. In conducting this inquiry, the *Deberry* court confined its review of Rule 16 to subparagraph (b). Under that subparagraph, as it existed when *Deberry* was decided, the State was required, upon the defendant's request, to produce for inspection, copying, or photographing "designated books, papers, documents, tangible objects, buildings or places, copies or portions thereof which are within the possession, custody or control of the State, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable."[42] Thus, all the material that is subject to disclosure under former Rule 16(b) was tangible physical evidence. That the current, identically worded version of Rule 16(b), found in Superior Court Criminal Rule 16(a)(1)(C), is entitled "Documents and tangible objects" further reinforces that the *Deberry* framework addresses missing physical evidence and not the observations of evidence-collecting law-enforcement officers.

Coleman's real complaint is not with the failure to collect or preserve physical evidence but is, rather, with the probation officer's evidence-collection methods, that is, his failure to record the position of the two .40 caliber magazines vis-à-vis the .40 caliber weapon. Coleman cites no authority, nor are we aware of any, that would

---

[42] *See Deberry*, 457 A.2d at 750 n.3.

15

support this expansion of the doctrine.[43]  For this and the other reasons discussed below, we are not inclined to extend our *Lolly/Deberry* "missing evidence" doctrine to the circumstances presented here.

C

Although Coleman has not explicitly relied on the *Lolly/Deberry* framework's inclusion of a *Brady* component—that is, whether the "missing evidence," if extant, would have been subject to a disclosure under *Brady*—he does point to the potentially exculpatory nature of the evidence.  Indeed, the assumption underlying the *Lolly/Deberry* rationale is that the missing evidence might by exculpatory.[44]  We therefore take this opportunity to briefly address Coleman's implicit *Brady* argument.

*Brady* is principally concerned with the prosecution's withholding of evidence that is favorable to the accused.  A *Brady* violation has three components: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or

---

[43] Oral Argument, at 9:14–9:48, *Coleman v. State*, No. 83, 2022 (Del. argued Oct. 19, 2022), https://livestream.com/accounts/5969852/events/10612709/videos/233387482/player.  The following exchange took place:

> The Court: Can you point to any cases where this Court has found a *Deberry* or *Lolly* violation where the actual physical evidence was collected, preserved, and produced, but that evidence was collected in a way where its evidentiary value may have been affected?
>
> Coleman's Counsel: I have not found one, your Honor.  I think this is a unique set of facts.

[44] *McNair*, 990 A.2d at 403 n.16.

16

impeaching; (2) that evidence is suppressed by the state; and (3) its suppression prejudices the defendant."[45]  *Brady* claims typically involve the withholding of evidence that is within the government's possession, custody, or control.[46]  Here, however, Coleman's claim is that the evidence was never possessed by the State because the investigating officer should have, but did not, collect the evidence.

In *Powell v. State*, this Court addressed a similar claim, although we note that, like the cases discussed above that applied the *Lolly/Deberry* framework, *Powell* involved the failure to preserve physical evidence.  The Court recognized a "broadly applicable principle" relevant to such claims:

> [F]or the police to have a duty to collect and preserve specific evidence, the police must have had a reason, at the time, to believe the evidence might be exculpatory.  In that regard, . . . "the duty to *preserve* exculpatory evidence does *not* include a duty to *seek out* exculpatory evidence."[47]

Under Coleman's argument, if the magazine bearing his fingerprint was inside the weapon, the likelihood that he possessed the weapon was greater than if it had been loose in the backpack.  Coleman couched this contention in the following terms:

> If the magazine with his fingerprint was in the weapon, that would have been powerful evidence of his guilt[].  The converse is also true.  If the

---

[45] *Starling v. State*, 882 A.2d 747, 756 (Del. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

[46] *See, e.g., Schaffer v. State*, 184 A.3d 841, 2018 WL 1747793, at *3 (Del. Apr. 10, 2018) (TABLE).

[47] *Powell v. State*, 49 A.3d 1090, 1101 (Del. 2012) (alteration in original) (quoting *Mason v. State*, 963 A.2d 139,  2009 WL 189839, at *1 (Del. Jan. 5, 2009) (TABLE)).

17

magazine with his fingerprint was not the one in the weapon, it is not proof that he possessed the weapon.[48]

It follows, according to Coleman, that evidence that the magazine with the print was loose in the backpack—had that been the case—would be exculpatory and the absence of that evidence, which was the consequence of the probation officer's negligence, should result in a rebuttable presumption that he possessed neither of the firearms found in his backpack. Implicit in Coleman's argument is the assumption that the jury would not have convicted him, or at least would have been less likely to convict him, had they known (or were directed to assume) that the magazine bearing his fingerprint was not found in the Smith & Wesson firearm, but merely in close proximity and in the backpack with it. This reasoning is, in our view, flawed in several respects.

First, by its verdict, the jury appears to have rejected Coleman's false dichotomy under which the jury would necessarily convict him if it believed the magazine with the fingerprint was in the weapon but otherwise would acquit. His counsel argued the same in his closing argument:

> We don't know which clip was up in the Smith & Wesson. If that clip had the fingerprints of [Coleman] . . . , I would submit to you that it would be logical to conclude that, not only had Devin Coleman touched that magazine, but he also touched and handled the firearm . . . . But we don't know. It's a 50-50 chance that that clip, the one with Devin's fingerprint on it, was the one that was lose in the bag.[49]

---

[48] Opening Br. at 34.

[49] App. to Opening Br. at A1500–01.

Coleman's counsel then observed that "50-50 [is] a tie," and that therefore the prosecution had not proven that Coleman possessed the Smith & Wesson beyond a reasonable doubt.[50]  But the jury was not bound to—and apparently did not—adopt Coleman's binary view of the significance of the fingerprint evidence.  In fact, it is more likely that the jury weighed the fingerprint evidence as we do.  For us, the relevance of the fingerprint evidence on the .40 caliber magazine is that it tended to establish that Coleman possessed a .40 caliber handgun.  Whether the magazine was found inside or outside the actual .40 caliber handgun found in the same backpack does not tip the scales one way or the other.  Unlike in *Deberry*, where the absence of blood and hair on the missing clothing would have created a reasonable doubt that Deberry committed the charged crimes, here the presence of Coleman's fingerprints on the .40 caliber magazine in close proximity to the weapon in question is hardly exculpatory even if, standing alone, "it is not proof that [Coleman] possessed the weapon."[51]

For purposes of our analysis, we have considered Coleman's best-case hypothetical scenario and have assumed that the probation officer recorded the positions of the two .40 caliber magazines at the time of seizure and that the fingerprint evidence was found on the loose magazine, not in the gun.  Would this

---

[50] *Id.* at A1501–03.
[51] Opening Br. at 34.

make it measurably less likely that the jury would convict Coleman of possessing the .40 caliber gun?  We think not.  From our point of view, the fingerprint on the magazine sitting next to the gun is, for all intents and purposes, and when considered with the other evidence of possession (i.e., Coleman's statement of the day before and the weapon's presence in Coleman's backpack) as incriminating as a fingerprint found on the magazine inside the gun.  It follows that the "evidence" upon which Coleman has constructed his *Lolly/Deberry* claim is not exculpatory in the sense we have recognized in our "missing evidence" case law.[52]

We have also considered a different scenario in which neither of the .40 caliber magazines bore Coleman's fingerprints and ask whether, in that hypothetical event, the evidence of Coleman's possession of the firearm would be sufficient to sustain his conviction.  In our view, it would be.  Viewing the evidence, including Coleman's statement the day before that he had purchased guns the day before that and the presence of two guns in a backpack found in Coleman's room and in his backpack, a reasonable juror could find Coleman guilty beyond a reasonable doubt of possessing one or both guns.  It is illogical in our view to conclude that, because in the actual event, fingerprints were found and those prints might have been on the

---

[52] This view of the purportedly missing evidence also undermines Coleman's claim that the probation officer's failure to record the original location of the magazines was negligent.  Put differently, we cannot fault the officer's failure if we ourselves discount the evidentiary relevance of whether the magazines were inside or outside the gun.

loose magazine, the absence of prints on the magazine inside the gun tends to show he did not possess the gun.

Coleman's argument also asks us to assume that the jury credited his self-serving testimony that purportedly explained away his recorded statement from the day before that he had "spent $1,700 on guns yesterday" and the presence of his fingerprint on what he posits was the loose magazine. But this assumption, as we have explained above, is belied by the jury's guilty verdict. The jury soundly rejected Coleman's claim that he was unable to purchase guns because of lack of funds. To the contrary, by all appearances, the jury concluded that Coleman possessed at least one of the two handguns found in his blue backpack—most probably, the .40 caliber Smith &Wesson,[53] given his possession of the unloaded .40 caliber magazine.

In sum, the evidence that Coleman claims was "missing" at his trial was of dubious exculpatory value. And to the extent it had any such value, Coleman has

---

[53] Coleman's argument assumes that the jury found him guilty of possessing the Smith & Wesson .40 caliber firearm and not the 9mm Ruger. This premise is based on the jury's acquittal of Coleman on the other weapon charge and the ammunition charge. According to Coleman, because the jury acquitted him on the ammunition charge and the 9mm Ruger was loaded, the guilty verdict must necessarily be directed to the .40 caliber Smith & Wesson firearm charge. But that is the type of assumption about a jury's deliberative framework that this Court has frequently, if not consistently, eschewed. It should be sufficient to note that, while Coleman posits a reasonable explanation of the jury's verdicts under which the conviction relates to the .40 caliber Smith & Wesson and the acquittal to the 9mm Ruger, that is not the only conceivable explanation. Because the evidence at trial was, in our view, sufficient to sustain a conviction for possession of either of the firearms, we are not prepared to conclude that the ammunition-charge acquittal, which could have been the product of jury lenity, means that the jury could not have convicted Coleman of possessing the Ruger.

not explained how that would have been apparent to the probation officer upon his seizure of Coleman's backpack and his discovery of the weapons and magazines in it.

III

Because the "missing evidence" that forms the basis of Coleman's argument is not physical evidence subject to disclosure under Rule 16 and was not, in any event, likely to be exculpatory, Coleman's *Lolly*/*Deberry* claim fails. We, therefore, affirm the Superior Court's judgment of conviction.