IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| LARRY ROSS, | § |
| | § No. 242, 2024 |
| Defendant Below, | § |
| Appellant, | § Court Below—Superior Court |
| | § of the State of Delaware |
| v. | § |
| | § Cr. ID Nos. 2304015612, |
| STATE OF DELAWARE, | § 2207016683 & 2203012499 (K) |
| | § |
| Appellee. | § |

Submitted: December 30, 2024
Decided: February 20, 2025

Before **SEITZ**, Chief Justice; **VALIHURA** and **GRIFFITHS**, Justices.

## ORDER

After consideration of the appellant's Supreme Court Rule 26(c) brief, the State's response, and the record on appeal, it appears to the Court that:

(1) A Superior Court jury found the appellant, Larry Ross, guilty of multiple crimes, including stalking, criminal contempt of a domestic violence protective order, and harassment. The Superior Court sentenced Ross to a total of ten years of Level V incarceration, suspended after one year and nine months for decreasing levels of supervision. This is Ross's direct appeal.

(2) The charges against Ross arose from his actions toward his ex-wife, Kizzie Green. After an incident in March 2022, a grand jury charged Ross with possession of a deadly weapon during the commission of a felony ("PDWDCF"),

aggravated menacing, terroristic threatening, harassment, and second-degree criminal trespass in Criminal ID No. 2203012499. Following Ross's appearance at Green's residence in July 2022, a grand jury charged him with non-compliance with bond conditions and criminal contempt of a domestic violence protective order in Criminal ID No. 2207016683. And based upon text messages Ross sent to Green between February and April 2023, a grand jury charged him with stalking, non-compliance with bond conditions, and criminal contempt of a domestic violence protective order in Criminal ID No. 2304015612. In September 2023, a grand jury re-indicted Ross for the charges in all three cases. In January 2024, the Superior Court granted the State's motion to amend the harassment, second-degree criminal trespassing, and stalking counts.

(3) The evidence presented at trial established that Ross and Green were married for seven years and had two children together. After they separated in early 2021, Green moved with the children into her parents' house. Ross and Green divorced in March 2022.

(4) On January 10, 2022, Green obtained a default protection-from-abuse ("PFA") order against Ross from the Family Court. The PFA order prohibited Ross from harassing Green or coming within 100 yards of her person, residence, or workplace. The PFA order was served upon Ross on May 18, 2022, and was effective until January 10, 2024.

2

(5)     On the morning of March 23, 2022, Green left for work in her Chevrolet Malibu. She had owned the car during her marriage to Ross, but it was registered to her only. Based on Ross's recent behavior, Green kept a kitchen knife in the center console of her car for protection. As Green was driving in the neighborhood to go to work, Ross stepped in front of the car, forcing her to stop. Green thought the car doors were locked, but Ross somehow managed to get into the car, possibly with an old key fob.

(6)     Ross started talking, and Green told him that she did not have time to talk because she was on her way to work and running late. Ross begged Green to take him to his car, which he said was at a nearby gas station. Green agreed to do so because Ross was already in the car.

(7)     When Green arrived at the gas station, she repeatedly asked Ross to get out of the car. Ross refused, insisting that they talk about their relationship. Green told Ross she was going to call the police if he didn't get out of her car. At that point, Green testified that Ross picked up the knife from the middle console, held it toward her in a threatening manner, and said "[s]omething like maybe I'll kill us both or I'll kill you."[1] Green jumped out of the car and called 911. She saw Ross flee on foot.

---

[1] Op. Br. App. at A189.

3

(8) The police arrived shortly thereafter and collected the knife from the passenger seat of Green's car. No fingerprints were detected on the knife and no DNA testing was performed. While Green was speaking to the police, Ross texted her:

> Why did you call the police. I told you to take your car. I was leaving. I just wanted answers. I love you. I would never hurt you.[2]

(9) Corporal Adam Smith of the Delaware State Police watched the video surveillance footage from the gas station. He testified that the footage showed Green's car with two people in it, including a man in the passenger seat, parked near a gas pump. He did not see a knife. After the car drove out of sight, a different camera angle showed Green walking away from the car with a man following her. Corporal Smith asked the gas station attendant to send the video footage to him, but he never did.

(10) Based on the State's failure to collect the surveillance video, Ross requested a *Lolly/Deberry*[3] jury instruction. The Superior Court denied the motion, holding that Ross would not be substantially prejudiced by the missing surveillance

---

[2] *Id.* at A202.

[3] *Lolly v. State*, 611 A.2d 956, 962 (Del. 1992) (holding that failure to gather material evidence entitles defendant to favorable inference instruction based on the missing evidence); *Deberry v. State*, 457 A.2d 744, 750 (Del. 1983) (holding that if State fails to preserve important physical evidence the defendant may be entitled to a jury instruction that the missing evidence would have been exculpatory).

video because it did not capture the entire incident and the police officer who watched the video could be cross-examined about any discrepancies between the video and Green's testimony. Corporal Smith was extensively cross-examined about the video, including his testimony that the video showed Green walking away from the car, not running away as she told him.

(11) Shortly after this incident, Green moved to a new home. She did not share the address with Ross. On May 18, 2022, Ross was arrested for the March incident and served with the PFA order. His bail conditions included having no direct or indirect contact with Ross, her residence, or her workplace. He also had to stay at least 100 yards away from Ross and her residence and was prohibited from sending her text messages.

(12) On July 30, 2022, around 2:51 a.m., Green's doorbell camera recorded Ross looking into her car, which was parked directly in front of her house. The recording also showed Ross approaching the house. Neither Green nor her children had invited Ross to the house. Green was scared when she saw Ross on the camera because she didn't know how he had discovered where she lived.

(13) On April 30, 2023, Green went to the Smyrna police about texts Ross was sending her. In the expletive-laden texts, Ross repeatedly accused Green of having an affair, seeing other people, taking their children, and ruining his life. Ross threatened to "expose" Green, guaranteeing she wouldn't "find the results f***king

funny."[4]  In a February 22, 2023 text message, Ross acknowledged the PFA order, stating "[y]ou lied on my life to cover your f***king infidelity and dragging our children in the middle of it by naming them in that protective order in which is still active."[5] Green felt threatened by Ross's text messages and was concerned that he was becoming delusional because he was saying things that were untrue.  Officer Ian McCardle took screen shots of the text messages on Green's phone, but did not seek a subpoena to recover the texts.

(14)  The jury found Ross not guilty of PDWDCF, aggravated menacing, and terroristic threatening.  The jury found Ross guilty of the remaining charges—harassment, second-degree criminal trespass, two counts of non-compliance with bond conditions, two counts of criminal contempt, and stalking.  The Superior Court sentenced Ross to a total of ten years of Level V incarceration, suspended after one year and nine months for decreasing levels of supervision.

(15)  On appeal, Ross's appellate counsel ("Counsel") filed a brief and a motion to withdraw under Supreme Court Rule 26(c).  Counsel asserts that, based upon a complete and careful examination of the record, there are no arguably appealable issues.  Counsel informed Ross of the provisions of Rule 26(c) and provided Ross with a copy of the motion to withdraw and the accompanying brief.

---

[4] A258; A277-78.
[5] A246-47.

6

(16) Counsel also informed Ross of his right to identify any points he wished this Court to consider on appeal. Ross has raised points for this Court's consideration. The State has responded to the Rule 26(c) brief and has moved to affirm the Superior Court's judgment.

(17) When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must: (i) be satisfied that defense counsel has made a conscientious examination of the record and the law for arguable claims; and (ii) conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[6]

(18) Ross's arguments may be summarized as follows: (i) he could not have violated the PFA order because it was entered by default and unserved; (ii) the doorbell recording did not show him committing any criminal conduct; (iii) the second-degree criminal trespassing conviction was too harsh for what the evidence showed; (iv) the Superior Court should have instructed the jury that harassment and aggravated harassment are lesser included offenses of stalking; (v) the not-guilty verdicts for the PDWDCF, terroristic threatening, and aggravated menacing charges meant that he could not have be found guilty of the other charges; (vi) Green made false accusations, deleted text messages she sent him, and contacting him while he

---

[6] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *Leacock v. State*, 690 A.2d 926, 927-28 (Del. 1996).

was subject to the PFA order and bond conditions; and (viii) his sentence is too long. After careful review, we find no merit to these arguments.

(19) Because the criminal contempt charges were based on Ross's violation of the PFA Order by going to Green's house in July 2022 and sending her text messages in 2023, we construe Ross's first argument as a claim that there was insufficient evidence to support the criminal contempt convictions. Generally, we review an insufficiency of evidence claim to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the defendant guilty beyond a reasonable doubt.[7] Because Ross did not move for a judgment of acquittal in the Superior Court, we review this claim for plain error.[8] "[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[9]

(20) There is no plain error here. To establish that Ross was guilty of criminal contempt of a domestic violence protective order, the State had to prove that he knowingly violated or failed to obey any provision of a protective order

---

[7] *Farmer v. State*, 844 A.2d 297, 300 (Del. 1990).
[8] Supr. Ct. R. 8; *Swan v. State*, 820 A.2d 342, 358 (Del. 2003).
[9] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

issued by the Family Court.[10] The issuance of the PFA order as a default judgment based on Ross's failure to appear for the hearing did not invalidate the PFA order, which prohibited Ross from going to Green's residence or contacting Green by text message. The evidence that Ross committed criminal contempt included the existence of the PFA Order, police officers' testimony that the Criminal Justice Information System showed that Ross was served with the PFA order on May 18, 2022, Ross's acknowledgment of the PFA order in a February 2023 text message, the doorbell video of Ross at Green's house on July 31, 2022, and the text messages Ross sent to Green in February 2023. Based on this evidence, a rational jury could find that Ross was guilty of criminal contempt.

(21) We construe Ross's second argument—that the doorbell video did not show him committing any crimes—as challenging the sufficiency of the evidence for the convictions arising from the July 31, 2022 incident. Those convictions consisted of criminal contempt and non-compliance with bond conditions. As previously discussed, Ross has not shown any plain error in the jury finding him guilty of criminal contempt.[11]

(22) Ross also claims that he could not be convicted twice of criminal contempt based on the same incident, but the convictions arose from different

---

[10] 11 *Del. C.* § 1271A.
[11] *See supra* ¶ 20.

9

incidents and did not violate the multiplicity doctrine.[12]  To determine if there is a violation of the multiplicity doctrine,  the Court "generally weigh[s] whether the defendant's acts are sufficiently differentiated by time, location, or intended purpose."[13]  The criminal contempt conviction in Criminal ID No. 2207016683 arose from Ross going to Green's house in July 2022 while the criminal contempt conviction in Criminal ID No. 2304015612 arose from Ross sending Green text messages in February 2023.  The July 2022 acts and February 2023 acts were sufficiently separated by time, location, and purpose to justify separate charges.

(23)  To establish that Ross was guilty of non-compliance with bond conditions, the State had to prove that he knowingly violated conditions of bond imposed in connection with felony charges.[14]  The evidence established that Criminal ID No. 2203012499 included felony charges, the conditions of the bond in Criminal ID No. 2203012499 included Ross staying at least 100 years away from Green or her residence, Ross signed the conditions of bond, and the doorbell recording showed Ross at Green's house on July 31, 2022.  Based on this evidence,

---

[12] "The multiplicity doctrine, which is rooted in the prohibition against double jeopardy, prohibits the State from dividing one crime into multiple counts by splitting it 'into a series of temporal or spatial units.'"  *Mills v. State*, 201 A.3d 1163, 1668 (Del. 2019) (quoting *Spencer v. State*, 868 A.2d 821, 823 (Del. 2005)).

[13] *Id.*

[14] 11 *Del. C.* § 2113.

a rational jury could find that Ross was guilty of non-compliance with bond conditions in Criminal ID No. 2207016683.

(24) We also construe Ross's argument that the second-degree criminal trespassing conviction was too harsh for what the evidence showed as a claim that the evidence was insufficient to support that conviction. To establish that Ross was guilty of second-degree criminal trespass, the State had to prove that he knowingly entered or remained unlawfully in a building.[15] A "building…includes any…vehicle."[16] The evidence that Ross committed second-degree criminal trespassing included Green's testimony that Ross entered her car without her permission and refused to leave when she repeatedly told him to do so. Ross has not shown any plain error in the jury finding him guilty of second-degree criminal trespass.

(25) Ross next argues that the Superior Court should have instructed the jury that harassment and aggravated harassment are lesser-included offenses of stalking. Ross did not request a lesser-included instruction for the stalking charge so we review for plain error.[17] There is no plain error here because such an instruction would have been inconsistent with Ross's trial strategy. Ross's defense at trial was that the State did not prove that he sent the text messages underlying the stalking

---

[15] 11 *Del. C.* § 822.

[16] 11 *Del. C.* § 222(1).

[17] Supr. Ct. R. 8; *Keyser v. State*, 893 A.2d 956, 960 (Del. 2006).

11

charge and that the messages were not harassing—not that the messages were harassing, but did not the constitute the course of conduct necessary for stalking.

(26) Contrary to Ross's belief, the jury's acquittal of him on the charges of PDWCF, aggravated menacing, and terroristic threatening did not require dismissal of the other charges against him. The PDWCF, aggravated menacing, and terroristic threatening charges arose from the March 2022 incident during which Green alleged that Ross threatened her with a knife. Most of the remaining charges arose from incidents that occurred months later and none of those incidents involved a weapon.

(27) Ross next accuses Green of making false accusations, deleting text messages she sent him, and contacting him while he was subject to the PFA order and bond conditions. Ross raised these claims at trial. Based on the verdict, the jury did not find most of these claims credible. It is the sole province of the jury to determine witness credibility, resolve any conflicts in the testimony, and draw any inferences from the proven facts.[18] The Court will not therefore substitute its judgment for that of the jury.[19]

(28) Finally, Ross argues that his sentence is too long. Our review of sentences is extremely limited.[20] If a sentence falls win statutory limits, as Ross's does, we consider only whether the sentence is based on factual predicates that are

[18] *Morgan v. State*, 922 A.2d 395, 400 (Del. 2007).
[19] *Poon v. State*, 880 A.2d 236, 238 (Del. 2005).
[20] *Mayes v. State*, 604 A.2d 839, 842 (Del. 1992).

false, impermissible, or lack minimal reliability, judicial vindictiveness or bias, or a closed mind.[21]  Ross cannot show that his sentence is based on factual predicates that are false, impermissible, or lack minimal reliability, judicial vindictiveness or bias, or a closed mind.

(29)   This Court has reviewed the record carefully and has concluded that Ross's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Counsel has made a conscientious effort to examine the record and the law and has properly determined that Ross could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is affirmed.  The motion to withdraw is moot.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Chief Justice

---

[21] *Weston v. State*, 832 A.2d 742, 746 (Del. 2003).

13